Jay HAMMOND, Appellant in No. 4281,

Chancy Croft, Appellant in No. 4282,

Lowell Thomas, Jr., Lieutenant Governor of Alaska, Patty Ann Polley, Director, Division of Elections, Mary Jo Hobbs, Supervisor of Elections, Juneau, Jo Ann Crane, Supervisor of Elections, Nome, Octavia Hansen, Supervisor of Elections, Anchorage, and Ann Spielberg, Supervisor of Elections, Fairbanks, Appellants in No. 4283,

Jalmar Kerttula, Appellant in No. 4291,

v.

Walter J. HICKEL and Edward A. Merdes, Appellees.

Walter J. HICKEL, Cross-Appellant in No. 4284,

Edward A. Merdes, Cross-Appellant in No. 4285,

v.

Lowell THOMAS, Jr., Lieutenant Governor of Alaska, Patty Ann Polley, Director, Division of Elections, Mary Jo Hobbs, Supervisor of Elections, Juneau, Jo Ann Crane, Supervisor of Elections, Nome, Octavia Hansen, Supervisor of Elections, Anchorage, Ann Spielberg, Supervisor of Elections, Fairbanks, Jay Hammond, Chancy Croft, and Jalmar Kerttula, Cross-Appellees.

Nos. 4281, 4282, 4283, 4284, 4285 and 4291.

Supreme Court of Alaska.

Oct. 20, 1978.

Robert H. Wagstaff, Wagstaff & Middleton, Anchorage, for Jay Hammond.

Douglas Pope, Anchorage, for Chancy Croft.

Avrum M. Gross, Atty. Gen., Juneau, and Ivan R. Lawner, Asst. Atty. Gen., Anchorage, for Lowell Thomas, Jr., et al.

Edgar Paul Boyko, Edgar Paul Boyko & Associates, Anchorage, and David Young, Los Angeles, for Walter J. Hickel.

Henry J. Camarot, Merdes, Schaible, Staley & DeLisio, Anchorage, for Edward A. Merdes.

John R. Snodgrass, Jr., Palmer, for Jalmar Kerttula.

Allen McGrath and Stephen C. Hillard, Graham & James, Anchorage, for Douglas McConnell, et al., amici curiae.

C. R. Kennelly, Kennelly & Azar, Anchorage, for the Alaskan Independence Party and Donald Wright, amici curiae.

Roger A. McShea, Anchorage, for Sara Jansen, et al., amici curiae.

Fredric R. Dichter, Anchorage, for Jesse L. Carr, et al.

## MEMORANDUM AND ORDER

## INTRODUCTION

Before RABINOWITZ, Chief Justice, CONNOR, BOOCHEVER and BURKE, Justices, and DIMOND, Senior Justice.

## PER CURIAM.

This case comes to this court on appeal from the decision of the superior court on cross-motions for summary judgment in an election contest brought pursuant to the provisions of AS 15.20.540. The superior court granted summary judgment to appellees and found that there was malconduct on the part of election officials which was sufficient to impeach the integrity of the election process and place the true outcome in doubt. Appellants have appealed from the summary judgment and appellees have cross-appealed as to those issues decided adversely to them by the trial court. For reasons set forth below we find it necessary to reverse the order of the trial court.[1]

AS 15.20.540 specifies those persons who may contest an election and the grounds for such a contest. It provides:

> *Grounds for election contest.* A defeated candidate or 10 qualified voters may contest the nomination or election of any person or the approval or rejection of any question or proposition upon one or more of the following grounds: (1) malconduct, fraud, or corruption on the part of an election official sufficient to change the result of the election; (2) when the person certified as elected or nominated is not qualified as required by law; (3) any corrupt practice as defined by law sufficient to change the results of the election.

In bringing this election contest, appellees alleged malconduct, fraud, or corruption on the part of election officials sufficient to change the result of the election. The trial court found no evidence of either fraud or corruption, and this finding is not challenged by appellees and cross-appellants. We find no reason to reverse this finding. The lower court did find, however, that there was "malconduct" sufficient to impeach the integrity of the election process and place the true outcome in doubt. This ultimate legal conclusion is necessarily predicated on two lesser, but critical conclusions of law: (1) a finding of malconduct on behalf of election officials and (2) a finding that such malconduct was sufficient to change the result of the election.[2]

## 1. THE CONCEPT OF "MALCONDUCT"

*Boucher v. Bomhoff,* 495 P.2d 77 (Alaska 1972), held that "malconduct," as used in AS 15.20.540, means a significant deviation from statutorily or constitutionally prescribed norms. *Boucher* involved a ballot proposal whose wording introduced a "significant bias" into the vote, in addition to being a significant deviation from constitutionally and statutorily prescribed norms. *Id.* at 80–81. If a bias has been introduced

---

1. While we find it necessary to reverse Judge Moody, we commend him on his able analysis and comprehensive treatment of the numerous complex issues. We also express our appreciation to the law clerks who worked around the clock with him in order to expedite the urgent decision.

2. The lower court eventually concluded that there was "cumulative malconduct" sufficient to change the result of the election. However, this conclusion regarding "sufficient to change the result" rests upon a finding of "doubt" as to the true vote of the people.

into the vote, we read *Boucher* as holding that "malconduct" exists if the bias can be shown to be the result of a significant deviation from lawfully prescribed norms.

◼ In the case before the court, we find no evidence of any irregularity causing bias in the vote. All irregularities were random in their effect, if any, on the casting of votes. Irregularities containing no element of bias, even if they amount to significant deviations from prescribed norms, do not necessarily constitute malconduct. Significant deviations which impact randomly on voter behavior will amount to malconduct if the significant deviations from prescribed norms by election officials are imbued with scienter, a knowing noncompliance with the law or a reckless indifference to norms established by law.[3] Thus, evidence of an election official's good faith may preclude a finding of malconduct under certain circumstances.[4]

◼ In concluding that there was malconduct on the part of election officials, the superior court, in several instances, cumulated individual irregularities which, when analyzed separately, did not amount to malconduct because such irregularities did not constitute "significant deviations" from prescribed norms. Under the facts presented, it was error for the trial court to cumulate isolated instances of irregularity to support a finding of malconduct. We believe that each alleged deviation from a statutorily or constitutionally prescribed norm must be analyzed individually to determine if it is "significant" and to ascertain if it involves an element of scienter. Once it is determined that the individual instance of noncompliance amounts to malconduct, a determination must be made of the number of votes affected. The total number of votes affected by all such incidents must then be considered in ascertaining whether they are sufficient to change the result of the election.

◼ It may be that, in rare circumstances, an election will be so permeated with numerous serious violations of law, not individually amounting to malconduct, that substantial doubt will be cast on the outcome of the vote. Under such circumstances, cumulation of irregularities may be proper and will support a finding of malconduct. *See, e. g., In re Contest of Election of Vetsch*, 245 Minn. 229, 71 N.W.2d 652 (1955). In the case at bar, however, while we find instances of malconduct, the isolated instances of irregularity do not so permeate the election with numerous serious violations of law as to cast substantial doubt on the outcome of the vote.

Alaska elections are primarily conducted by many volunteer workers. Unique problems are presented in the vast area encompassed as well as the varied cultural backgrounds and primary languages of voters. Under these circumstances minor irregularities and other good faith errors and omissions may be anticipated, although we do not condone any such departures from lawful requirements. From the evidence presented, the errors that occurred in this election appear to be of that nature. There were no such numerous serious violations as to permeate the entire election process, so as to require the extreme remedy of a new election. Accordingly, the superior court's conclusion, based on cumulation of irregularities, that a new primary election is required, is reversed.

### 2. THE CONCEPT OF "SUFFICIENT TO CHANGE THE RESULT"

Any malconduct on the part of election officials must be of sufficient magnitude "to change the results of the election." AS 15.20.540.[5] In the present case, the trial

---

3. In common usage, malconduct is defined as: "Ill conduct, especially dishonest conduct, maladministration, or, as applied to officers, official misconduct." Black's Law Dictionary 1108 (rev. 4th ed. 1968). *See also McGallagher v. Bosarge*, 273 Ala. 133, 136 So.2d 181 (1961); *Taliaferro v. Lee*, 97 Ala. 92, 13 So. 125 (1893).

4. *See Turkington v. City of Kachemak*, 380 P.2d 593, 595 (Alaska 1963).

5. We have interpreted this to mean that a party challenging an election must prove "that the alleged misconduct *could have changed* the result of the election." *Boucher v. Bomhoff*, 495

court found cumulative malconduct sufficient to change the result of the primary election, but made no finding as to how the votes allegedly affected by malconduct could have changed the result of the election. Fulfillment of the statutory requirement rested on the court's belief that the malconduct impeached the integrity of the election process and placed the true outcome in doubt. This was error.

We believe that more concrete standards must be applied in order to determine if votes affected by malconduct are sufficient in number to change the result of the election. The method used to determine if the malconduct could have changed the result of the election will depend upon whether the malconduct injected a bias into the vote. If the bias has tended to favor one candidate over another and the number of votes affected by the malconduct can be ascertained with precision, all such votes will be awarded to the disfavored candidate to determine if the result of the election would be changed. If the number of votes affected by the bias cannot be ascertained with precision, a new election may be ordered, depending upon the nature of the bias and the margin of votes separating the candidates. *See Boucher v. Bomhoff*, 495 P.2d 77 (Alaska 1972). Where the malconduct has not injected any bias into the vote, but instead affects individual votes in a random fashion, those votes should be either counted or disregarded, if they can be identified, and the results tabulated accordingly. Finally, if the malconduct has a random impact on votes and those votes cannot be precisely identified, we hold that the contaminated votes must be deducted from the vote totals of each candidate in proportion to the votes received by each candidate in the precinct or district where the contaminated votes were cast. *See, e. g., Grounds v. Lawe*, 67 Ariz. 176, 193 P.2d

447, 453 (1948); *Singletary v. Kelley*, 242 Cal.App.2d 611, 51 Cal.Rptr. 682 (1966); *Russell v. McDowell*, 83 Cal. 70, 23 P. 183, 184 (1890); *Thornton v. Gardner*, 30 Ill.2d 234, 195 N.E.2d 723, 724 (1964). Similarly if a specified number of votes should have been counted but are no longer available for counting, they should be added to the vote totals of each candidate in proportion to the votes received by the candidate in the precinct or district in which the votes would otherwise be counted.[6] The invalid votes will be deducted in this pro rata fashion to determine if the malconduct could have affected the result of the election. This is the procedure which should have been followed here with respect to those votes randomly affected by those actions of election officials which amount to malconduct.

### 3. THE TAYLOR WEST INCIDENT

The superior court erred in concluding that malconduct committed by virtue of Taylor West's handling of approximately 2,000 questioned ballots should be considered, in determining whether there was cumulative malconduct sufficient to change the result of the primary election.

Taylor West, age seventeen, was employed by the Division of Elections as a full-time election clerk from June 12 to August 29, 1978. On the evening of August 22, 1978, he was working in the computer counting center at 5700 Tudor Road, in Anchorage. At approximately 10:00 p. m., in the performance of his official duties, West took possession of some 2,000 questioned ballots which were to be transported from the computer center to the Anchorage elections office. West placed the ballots, contained in two large bags, in his car. He then drove to his place of residence where he parked and locked the vehicle, leaving the ballots in it overnight. At approxi-

P.2d 77, 80 n. 5 (Alaska 1972). The contestant need not show that the malconduct in fact changed the result of the election.

**6.** If the proportion of votes to be counted to the proportion voted in the precinct or district is so great as to render this method unsuitable based

on a statistical approach they should be counted according to the ratio of votes received in the statewide election. The remedy of a re-election may be required under certain circumstances. *See Finkelstein & Robbins, Mathematical Probability in Election Challenges,* 73 Colum.L.Rev. 241 (1973).

mately 7:00 a. m. the next morning West returned to the car. He found it still locked and the contents appeared to be undisturbed. He then drove to the elections office where he again parked and locked the car. The ballots were left in the car until later in the morning, when they were unloaded and taken into the elections office by West.

The superior court found that West and his supervisors were guilty of malconduct in the handling of these ballots, in that they failed to provide adequate security against possible tampering, thereby destroying public confidence in the election process. The court concluded that such action "constitutes a significant deviation from any conceivable norm of ballot security within the clear thrust of [the election code] and is malconduct."

We agree with the conclusion that West's handling of the questioned ballots was malconduct, and hold accordingly. However, we disagree with the superior court's further conclusion that such malconduct should be considered in determining whether there was cumulative malconduct sufficient to change the result of the primary election.

The superior court found: (1) that there was no evidence that the ballots had been disturbed or tampered with during the time they were in West's custody, (2) that West's possession of the ballots was "technically" lawful under AS 15.55.050 and AS 15.60.-010(13), and (3) that there was no reason to invalidate them. We agree. Such being the case, we fail to understand how the malconduct connected with this particular incident could contribute in any way to change the result of the election.

4. HANDLING OF BALLOTS AND BALLOT SECURITY

    (a) *Ballots from Kotlik and Kwethluk*

In Kwethluk and Kotlik a total of 141 ballots (104 from Kwethluk and 37 from Kotlik) were discarded rather than mailed to the lieutenant governor, as required by AS 15.15.370. This amounts to a significant deviation from the positive statutory duty placed upon the election board to mail the ballots to the lieutenant governor. This deviation does not in itself, however, require that these votes be disallowed.

■ We hold that AS 15.15.430, read in conjunction with AS 15.15.440, permits the election certificate to be considered as evidence of the election result, in the absence of evidence of fraud, corruption, or scienter on the part of any member of the election board in tallying the votes and executing the certificate.

Appellees assert that the Kotlik and Kwethluk ballots, which were later recovered, cannot be utilized because they were mutilated and because there was an opportunity to tamper with those ballots. However, given the particular facts surrounding the recovery of the ballots, the ballots could be of some value in demonstrating that the certificate of the election board was entitled to be included in the canvass by the lieutenant governor.

The affidavit of Ms. Jo Ann Crane, election supervisor for Northwest Alaska for the August 22, 1978, primary election, states that Ms. Crane was informed by her staff that the only major mistake made by those election precincts was the failure of the respective election chairmen to send the used ballots to Juneau. The election results in each district were tallied in a tally book, reported to the election office in Nome by telephone, and ultimately by certificate on the cover of the tally book. Christopher Aketachunak, election chairman in Kotlik, sent unused ballots, ballot stubs, one tally book and two questioned ballots to Juneau. He stated that he "destroyed" the ballots thinking that he did not need to send them in to Juneau as he had certified the official count on the tally book. Similarly, the used ballots were "destroyed" in Kwethluk.

In recount proceedings the envelopes containing the unused ballots were presented. Thirty-seven ballots were cast in Kotlik, and unused ballots numbered from 38 upwards were presented upon recount.

In investigative proceedings subsequent to the recount, a state ombudsman investigator discovered 35 out of the 37 ballots

from Kotlik, and 104 of the Kwethluk ballots, all 104 ballot bottoms, and 78 of the tops, were discovered. The return of the unused ballots to Juneau, coupled with the discovery of a significant portion of the used ballots from both locations, justifies a finding that election fraud was unlikely, and the vote tallies were entitled to be counted by the lieutenant governor in the original tally and the recount. The returning of the unused ballots, and the recovery of part of the used ballots tend to corroborate the validity of the local election boards' certificates.

### (b) The 247 questioned ballots from District 6

The superior court found that 247 questioned ballots from District 6 in Anchorage were misplaced by election officials and were discovered in an unlocked cabinet in the election office in Anchorage on September 23, 1978, well after the certification of the primary election nominees.

Each of these ballots is contained within two sealed envelopes. An expert witness called by the state testified that there was a high degree of probability that no tampering with the envelopes had occurred. Appellees' expert witness could find no evidence that the envelopes had been tampered with. Neither expert could say conclusively, i. e., with absolute certitude, that the envelopes had not been tampered with. We note the circumstance that if someone had tampered with the ballots it would be unlikely that he would put them in a place where they would not be discovered until after the election contest had commenced.

In these circumstances we hold that the state met its burden of proof, by a preponderance of the evidence, that the ballots were not the instrument of fraud and that it was probable that they had not been tampered with. *See In re Democratic Primary Election of Somerset Township*, 405 Pa. 169, 174 A.2d 23 (1961); *Appeal of McCaffrey*, 337 Pa. 552, 11 A.2d 893 (1940); *Robinson v. Osborne*, 314 S.W.2d 681 (Ky. 1958); *Tebbe v. Smith*, 108 Cal. 101, 41 P. 454 (1895).[7] While we affirm the factual findings of the superior court, we reverse its holding as to the legal standard to be applied to those findings. Under the applicable law the ballots are entitled to be counted and added to the totals of the various candidates.

It follows that these ballots should be counted and added to the totals of the various candidates. The state asserts that election officials have determined that ten of these ballots were cast by persons not properly registered. Those ballots should be eliminated from the count if that is the case.

### 5. THE BAG OF BALLOTS FOUND IN JUNEAU ON SEPTEMBER 29, 1978

On September 29, 1978, Mr. James Thompson noticed a bag of ballots in Juneau while examining election materials on behalf of candidate Hickel. Upon seeing the bag and checking its contents, Mr. Thompson became suspicious of commingling and counting of improper ballots. The materials found by Mr. Thompson were the envelopes and other materials segregated as a result of the September 18, 1978, recount in which rejected questioned ballots were reviewed. The superior court found "no significant deviation from proper security" for these ballots. We agree and affirm the court's finding of no malconduct.

### 6. THE 15 BALLOTS FOUND IN JUNEAU

This item is not covered by the superior court's memorandum decision, but it is cov-

---

7. Appellees cite *MacWherter v. Turner*, 52 Ill. App.2d 270, 201 N.E.2d 325 (1964); *Armbrust v. Starkey*, 3 Ill.2d 131, 119 N.E.2d 910 (1954); *Nickerson v. Aimo*, 110 N.H. 348, 266 A.2d 828 (1970); *Thoms v. Andersen*, 235 N.W.2d 898 (S.D.1975); *Ryan v. Montgomery*, 396 Mich. 213, 240 N.W.2d 236 (1976); *Bethard v. Mink*, 10 Ill.App.3d 525, 294 N.E.2d 702 (1973); *Coombs v. Barger*, 100 Utah 451, 116 P.2d 390 (1941); *Wilson v. Burridge*, 346 P.2d 282 (Wyo. 1959); and *Kincer v. Holbrook*, 307 S.W.2d 922 (Ky.1967). They assert that these cases require that in circumstances such as this it must be shown that there was no reasonable opportunity for tampering with the ballots. We find some of these cases distinguishable in various respects and others simply not persuasive. Moreover, some of these cases actually support the position of the state.

ered in the report of the special master and has been raised in this appeal. It appears that 12 of these ballots, inadvertently left among empty outer envelopes sent to Juneau from the Anchorage election office, have been kept under adequate security. They should now be counted and added to the totals of the various candidates. As to the remaining three ballots, our views are as follows.

The ballot from District 3 should not be counted, for the reasons stated in the Master's Report.

The ballot from District 20 may be counted if the qualifications of the voter, and the validity of the ballot, are established through the regular procedures of the election officials.

The ballot from District 17 should not be counted, for the reasons stated in the Master's Report.

## 7. ADMITTED IRREGULARITIES

The noncandidate appellants conceded for purpose of the summary judgment motion that 57 unregistered voters were permitted to cast ballots in the election, 38 additional ballots were improperly counted and two registered voters were wrongfully denied the franchise. In our view, the admitted

mishandling of these 97 ballots constituted malconduct on the part of election officials, and the ballots should not have been included in the vote totals of the various candidates. Each candidate's final vote count must therefore be reduced on a pro rata basis to reflect the presumably random distribution of ballots invalidly cast,[8] for the purpose of determining whether the irregularly cast votes were sufficient to change the result of the election.

## 8. DISCREPANCIES BETWEEN NUMBER OF BALLOTS CAST AND NUMBER OF SIGNATURES ON THE REGISTER

Appellees alleged in their motion for summary judgment before the superior court that several hundred ballots given to voters who signed the original registers were lost or unaccounted for.[9] This allegation was based on a comparison of the total number of ballots cast in certain districts and the number of voter signatures appearing on the original registers. The state's subsequent audit of the registers showed that most of these discrepancies were explainable as errors in the original register which were traceable through the duplicate register and the questioned voter register.[10] The noncandidate appellants conceded that

8. The result of the pro rata reduction in vote totals for each candidate is indicated in the Appendix.

9. AS 15.15.180 provides for the keeping of an original register at the polling place:

The judges shall keep an original register in which each voter before receiving his ballot shall sign his name and give both his resident and mailing address. A record shall be kept in the registration book in space provided of the name of persons who offer to vote but who actually do not vote, and a brief statement of explanation. The signing of the register constitutes a declaration by the voter that he is qualified to vote.

10. The superior court's findings of fact establish that election officials were instructed regarding the use of three registers: the main original register, the duplicate register and the questioned voter register. The normal procedure on election day was as follows:

[A] voter would sign his or her name to the main original register upon entering the polling place. The election official would then

check the name against the duplicate register, which consisted of a computer printout listing the names of all registered voters in the precinct. If the voter's name appeared on the duplicate register, he was given a regular ballot and allowed to vote.

If the voter's name was not on the duplicate register, election officials were instructed to place the person's name on the questioned voter register which, depending on the precinct, consisted either of a separate register book or a section at the back of the main original register. In addition, there was a space on the back of the envelope containing the duplicate register which could be used to list questioned votes.

In some precincts, a slightly different procedure was followed under which voters were asked their names and checked against the duplicate register before they signed the main original register. If the voter's name was not on the duplicate register he or she was asked to sign the questioned voter register only.

approximately 80 of the apparent discrepancies remain unresolved.[11] However, the superior court found that the number of ballots involved were "not of such a magnitude . . . to warrant any conclusion of malconduct." This holding is affirmed.[12]

### 9. CROSS–PRECINCT VOTING

We affirm the superior court's holding that cross-precinct voting is authorized by statute. Cross-precinct voting occurs when a voter, registered in one precinct, votes a questioned ballot in a different precinct in the same election district. There is no constitutional requirement of precinct residency, and there is clear statutory authorization for persons claiming to be registered voters to vote a questioned ballot if there is no evidence of registration in the precinct in which the voter seeks to vote. The lieutenant governor or his representative is required to determine whether the voter is registered in the election district before counting the ballot. *See* Alaska Const. art. V, § 1, AS 15.07.090, 15.15.-213, 15.15.215 and 15.20.210.

### 10. CROSS–DISTRICT VOTING

A much more difficult problem is involved in considering the legality of cross-district voting. Cross-district voting occurs when a voter, registered in one district, casts a questioned ballot in a different district. Questions are presented with reference to the constitutionality of such voting under art. V, § 1 of the Constitution of the State of Alaska, which states that a voter shall have been a thirty-day resident of the election district in which he seeks to vote. Moreover, the statutory authority referred to in paragraph 9, *supra*, is confusing as it pertains to cross-district voting because of the requirements that the lieutenant governor or his representative determine whether a voter is registered in the district before counting the ballot. AS 15.07.090(d). Since challenges of questioned ballots are to be determined in the same manner as challenged absentee ballots, AS 15.20.210(b) may possibly be construed as authorizing the counting of cross-district votes for statewide candidates.

The superior court found that since 1968 it has been the general policy of state election officials to allow persons outside their home districts to cast a questioned vote, and then count the ballots if the persons are properly registered. Allowing cross-district voting has been the practice of the Division of Elections, at least since the 1972 general election.

One voting in a district other than that in which the voter is registered must cast a questioned ballot. The voter places the ballot in a small blank envelope which is sealed and then put in a larger envelope on which the information concerning that voter's residence is located. The larger envelope is then sealed. AS 15.15.215.

The merits of the questioned ballot are determined in accordance with the procedure prescribed for challenged absentee ballots. AS 15.15.215.

Provision is made for the challenge by the election supervisor or the district absentee canvassing board of the name of an absentee voter when read from the voter's certificate on the back of the larger envelope if there is good reason to suspect that the challenged voter is not qualified to vote. AS 15.20.210. Challenged votes are segregated and the inner envelope is not removed, mingled with other votes, nor counted. Without a timely challenge, the votes are irretrievably mingled.

Representatives of candidates may be present at the district canvass. The superior court found that during the canvass, representatives for candidates Hickel and Merdes were present during the counting of cross-district questioned ballots. In fact, Mr. Mead Treadwell of the Hickel for Governor Committee, in a letter dated Septem-

---

**11.** The audit first concluded that 89 total ballots could not be accounted for through signatures on the different registers. This number was later revised down to 80 as nine of the discrepancies were resolved.

**12.** It should be emphasized here that the 80 unexplained discrepancies are distinct from the 97 conceded irregularities discussed in a separate section of this memorandum and order.

ber 7, 1978, the day before the completion of the canvass, requested that certain cross-district ballots be counted. Certainly the candidates had every opportunity to make known to the canvassing board any objections to a long established procedure such as cross-district voting.

We affirm the trial judge's holding that challenges to the validity of cross-district voting are waived if not raised before the ballots are separated and commingled. To hold otherwise would permit parties to withhold challenges to await the outcome of an election and then, after it is too late to prevent the mingling of ballots, contest their validity. *Opinion of the Justices*, 371 A.2d 616, 619 (Me.1977); *Bell v. Gannaway*, 303 Minn. 346, 227 N.W.2d 797, 804–05 (1975).[13]

## 11. ADMINISTRATION OF CROSS–DISTRICT AND CROSS–PRECINCT VOTING

The superior court found that the administration of cross-precinct and cross-district

**13.** Chief Justice Rabinowitz and Senior Justice Dimond would hold that cross-district voting is no violation of the Constitution of the State of Alaska and is authorized by statute.

**14.** We rely only on those affidavits which are in proper order. These include the affidavits submitted by Roger L. Hartig, Dorothy F. Fetrow, Pauline May Farr, Phyllis D. Fishcer, Donna Agasti, Gertrude E. Wells, Hazel Gallagher, Virginia Ryder, and Oscar Geravitis.

**15.** The evidence indicated that the procedures followed by election officials with respect to cross-precinct and cross-district voters were as follows:

1) Those voters whose names were not discovered on the precinct registration list were advised to go to their own election precinct to vote.

2) In some cases, this precinct was located in another voting district.

3) Some of those voters whose names were not discovered on the registration lists insisted on voting questioned ballots and were permitted to do so.

4) Other voters did not insist and either journeyed to their proper precinct and cast their vote or chose not to vote.

5) Still other voters were not told to go to their proper precinct if it appeared that they might be disenfranchised because of time constraints (e. g., not being able to reach

voting by election officials at the local level constituted malconduct because of nonuniform and discriminatory application of voting procedures to individual voters. In addition, the trial court found that the state supplied inconsistent and conflicting information to voters and to election officials regarding policy on cross-district voting.

We believe that, based upon the law and the facts, a finding of malconduct on behalf of election officials was error. We do not think that the facts reveal a nonuniform or discriminatory application of voting procedures to individual voters. The affidavits presented by appellees[14] tend to prove that the state's policy with respect to cross-precinct/cross-district voting was applied in an evenhanded fashion.[15] The affidavits of Patricia Ann Polley, Director, Division of Elections, and Betty Irvine, an elections official, reveal that the facts asserted by appellees' affiants were in accordance with the state's instructions to election officials.[16] There is no evidence to support the

their proper precinct before the polls would close). They voted questioned ballots.

**16.** The area election supervisors and local election supervisors received the following instructions:

(a) A voter is to be instructed to vote in the precinct in which he resides and is registered.

(b) When a voter moves to a new precinct he should transfer his registration to the new precinct at least 30 days prior to an election.

(c) If a voter fails to transfer his registration, he should either vote a regular absentee ballot in the precinct in which he is registered or vote a questioned ballot in the precinct in which he resides.

(d) If a person knows he will be absent from his precinct on election day, he should request an absentee ballot by mail or vote in an in-person absentee ballot before a local absentee ballot election official.

(e) If a person finds himself out of town on election day, he should vote a questioned ballot at the place he finds himself.

(f) If a person is in his town of residence, but through exigent circumstance or limited time cannot reach the polling place of his precinct of residence, he should vote a questioned ballot in any other precinct.

(g) Any voter insisting on voting a questioned ballot in any precinct for any reason should be allowed to do so.

trial court's finding that hundreds of voters were denied their right to vote by being turned away from the polls or that thousands of voters would have exercised their franchise had the state's policy been made a matter of general knowledge.[17] Accordingly, we find no evidence of nonuniform enforcement sufficient to constitute malconduct.

The superior court also concluded that the state supplied inconsistent and conflicting information to voters regarding policy on cross-precinct/cross-district voting. While we believe that there was some conflict in the state's messages, we hold that such inconsistencies neither amounted to a significant deviation from statutorily prescribed norms nor were they the product of conduct involving scienter. The lieutenant governor and election officials were acting in good faith in an attempt to enfranchise as many qualified voters as possible in accordance with what they perceived to be a valid and long-standing state policy. The superior court's finding of malconduct must therefore be reversed.

## 12. VOTER REGISTRATION

■■■ Concerning voter registration, the superior court held that "[i]n failing to follow the clear directive of AS 15.07.065, the lieutenant governor committed malconduct."[18] This statute provides:

The lieutenant governor shall enter into reciprocal agreements or other arrangements for the exchange of voter registration information with the election officers in other jurisdictions to ensure that the state's voter registration register is accurate and up to date and to preclude a person from voting in Alaska and in another jurisdiction at the same election, thus preventing election fraud.

Counsel for the lieutenant governor conceded that no formal agreements have been entered into by the lieutenant governor pursuant to this statute but nevertheless contends that the lack of formal reciprocal agreements does not constitute malconduct in the circumstances of this case. Our review of the record and the statutes implicated convinces us that the superior court erred in holding that the lieutenant governor failed to comply with AS 15.07.065 and that such noncompliance constituted malconduct on his part.

Although it might have been preferable for the lieutenant governor to have made efforts to enter into formal reciprocal agreements with other states where feasible,[19] the record discloses that the lieutenant governor's staff routinely sends notices of cancellation of previous voter registration to other jurisdictions when informed by applicants that they are registered voters of other jurisdictions. It also appears that at times the registrant is given the cancellation notice card and requested to forward it to the former voting jurisdictions. The record further demonstrates that Alaska regularly receives information similar in character in return. Given the foregoing, we conclude that no basis exists for a holding that the lieutenant governor did not comply with the provisions of AS 15.07.065.[20]

17. The state's policy with respect to cross-precinct and cross-district voting was not contained in the "Alaska Voter Handbook" or in the "Instructions to Voters in State Elections." Public announcements were made, however, over radio and through the press of the opportunity so to vote.

18. The superior court further found that the lieutenant governor and key staff members had callously disregarded statutory requirements pertaining to voter registration. More specifically, the court found:

AS 15.07.065 has not been complied with at all. This court is not convinced by the proffered excuse that compliance would be too difficult or costly. Even assuming this to be true, the Lt. Governor had an affirmative duty to seek a more workable provision for ensuring the accuracy of Alaska's voter registration list.

19. It appears that very few states have a central election office.

20. We note that the second stated purpose of AS 15.07.065 is not applicable to the situation of Alaska's primary. This latter purpose of the statute is intended to prevent persons from voting more than once in elections for national offices.

Additionally, the superior court observed that there had been only a perfunctory attempt on the lieutenant governor's part to comply with AS 15.07.060.[21] We have concluded that it is unnecessary to determine whether or not there is adequate factual basis for the superior court's characterization. The superior court did conclude that "There is no evidence showing that any individual did, in fact, vote in Alaska and elsewhere at the same time." Pursuant to voter registration forms furnished by the lieutenant governor, the registrant is required to supply the information called for by the form itself. The only information not supplied in the form is whether the voter has previously been registered to vote in another jurisdiction. As to this information, the record indicates that registration officials routinely request this data verbally when a person seeks to register.

### 13. PRUDHOE BAY "PERSONAL REPRESENTATIVE" ABSENTEE BALLOTS

The superior court found that 532 voters working in the Prudhoe Bay area were issued absentee ballots obtained for them and delivered to them by business agents for Teamsters Local 959, who were acting as their "personal representatives." Each of these voters obtained their absentee ballot by filling out an application form which authorized a personal representative to obtain an absentee ballot for them. The election supervisor in Fairbanks ascertained that each of these voters was properly registered to vote in Alaska and issued the ballots pursuant to an interpretation of the various sections of Alaska's election code providing for absentee ballots.[22] Appellees agree that these voters were entitled to vote by absentee ballot pursuant to AS 15.20.010(3), but argue that these voters were not entitled to obtain absentee ballots by personal representative.

AS 15.20.010(3) allows a voter to vote by absentee ballot "if he believes he will be unable to be present at the polls because of the physical inaccessibility of the polling place causing undue travel expense, hardship, or hazard to [him]."[23] Each of these registered voters at Prudhoe Bay met this standard.[24] Other statutory sections provide that a "qualified voter" may apply in person, by personal representative, or by mail for an absentee ballot.[25] Yet another

---

**21.** AS 15.07.060(a) provides:
> Each applicant who requests registration or re-registration shall supply the following information:
> (1) name and sex;
> (2) address and other necessary information establishing residence if requested;
> (3) election district and precinct as of the date of registration;
> (4) term of residence in state and in election district; and whether the applicant has previously been registered to vote in another jurisdiction, and if so, where;
> (5) a declaration that the registrant will be 18 years of age or older on or before the date of the next statewide election;
> (6) a declaration that the registrant is a citizen of the United States;
> (7) date of application;
> (8) signature or mark.
> (b) If the applicant has been previously registered to vote in another jurisdiction, he shall surrender to the registration official any voter registration or identification card or credentials from that jurisdiction the applicant may possess. The lieutenant governor shall notify the chief elections officer in that jurisdiction that the applicant has registered to vote in Alaska, request that jurisdiction to

> cancel the applicant's voter registration there, and return the applicant's voter registration or identification card or credentials, if any, to that jurisdiction.

**22.** These provisions are AS 15.20.010 to 15.20.-220 of Alaska's election laws. As appellees Hickel and Merdes made clear in their memorandum in support of their motion for summary judgment in the superior court, "[n]o contention is being raised that the persons who voted were not registered voters."

**23.** AS 15.20.010(3).

**24.** No election district or polling place had been established at Prudhoe Bay. We agree with the superior court's conclusion that it was not malconduct for Lt. Governor Thomas to fail to establish a voting precinct at Prudhoe Bay, because he could have reasonably concluded that there were not sufficient permanent residents there to merit a voting precinct or that voters residing there were registered elsewhere in the state. *See* AS 15.10.050.

**25.** AS 15.20.060–70. Application in person or by a representative may be made to certain election officials in either the election district

statutory section, AS 15.20.150, provides the methods by which a ballot obtained through a personal representative or by mail may be cast. In addition to technical standards designed to authenticate such a ballot,[26] this section provides that the ballot may be returned by personal representative to the election official who provided it or by the "most expeditious mail service, postmarked not later than the day of the election, to the election supervisor in his district." [27]

It was on these general provisions concerning personal representative absentee voting that election officials based their decision to issue the absentee ballots in question to registered voters at Prudhoe Bay who were qualified to vote by absentee ballot. However, AS 15.20.120(a), specifying the basis on which an election official is to make the decision to issue an absentee ballot to a designated personal representative, injects confusion into the statutory scheme. This section provides that the voter's application for such a ballot must be "signed by the applicant and . . . accompanied by a letter from a licensed physician or a statement signed by two qualified voters stating that the applicant will be unable to go to the polling place because of physical disability." While this section is anomalous and difficult to integrate consistently into the statutory scheme of provisions detailing the issuance and use of personal representative absentee ballots, it is the only section of the chapter which provides election officials with explicit standards for their decisions to issue such ballots. For this reason the superior court was arguably correct in its conclusion that personal representative absentee ballots should be issued only where the requisite showing of "physical disability" is made by the voter.[28] The superior court found that none of these Prudhoe Bay voters were in fact "physically disabled."

However, we do not conclude, as did the superior court, that the decision to issue these ballots amounted to an act of malconduct by election officials. These ballots were issued as a result of the good faith attempt by those officials to interpret and implement an ambiguous statutory scheme providing for personal representative absentee ballots.[29] The purpose and effect of this interpretation was to allow properly registered Alaskan voters, who otherwise might have been unable to register their political preferences, to vote by absentee ballot. There was no evidence that the election officials were motivated by bias or a partisan desire to influence the outcome of the election. As the superior court concluded, the decision to issue these absentee ballots to the Prudhoe Bay voters' personal representatives "arose from commendable intentions or good faith by the election officials involved." For these reasons, we can-

or precinct in which one is registered to vote. If time does not permit the voter to apply in this manner or by mail, he may apply for an absentee ballot in person or by a personal representative to any election supervisor. AS 15.-20.065. The Prudhoe Bay voters here applied to the election supervisor in Fairbanks.

26. The voter "may proceed to mark the ballot in secret" in the presence of an attesting witness who is at least 18 years of age. The ballot is then to be placed in "the small blank envelope," which is in turn placed in a larger envelope to which is attached the "voter's certificate" signed in the presence of either certain officials or the attesting witness.

27. The evidence showed that some of these ballots which were cast were returned by personal representative and others returned by mail.

28. The statutory sections governing absentee ballot voting by personal representative are confusing and unclear. We strongly recommend that the legislature expressly define the requirements which a voter must meet in order to obtain and cast an absentee ballot by personal representative.

29. Election officials interpreted AS 15.20.120(a) as specifying only one basis for the issuance of absentee ballots to personal representatives. They considered physical inability to get to the polls an equally valid reason in light of the language in other sections of the statutory scheme. They used application forms which certified the voter as "unable to go to the polling place due to physical disability" for both types of ballot requests. They informed the personal representatives involved here that this form had not been changed in years, but as a matter of practice was used for requests based on either physical disability or inability.

not hold that election officials significantly deviated from a statutory mandate in a way that was knowingly or recklessly indifferent to that mandate.[30]

## 14. ABSENTEE BALLOTS

■■ AS 15.20.150 provides that an absentee ballot is to be marked by the voter and placed in a small blank envelope. The voter then places the small envelope in a larger envelope, and signs the voter's certificate on the back of the larger envelope in the presence of an election official or some other witness. The date that this is done is shown on the certificate. AS 15.20.150 also requires in part that an absentee ballot be postmarked not later than the day of election.

AS 15.20.170 provides that an election official shall stamp on the outer or larger of the two envelopes containing the voter's certificate or oath the date on which the ballot is received in his office.

The parties have stipulated for purposes of appeal that certain absentee ballots did not meet one or the other, or both of the above requirements relating to postmarking and stamp dating by election officials. Appellees contend that the postmark and date stamp requirements are mandatory, and that election officials committed malconduct by counting such ballots.

The state has conceded that 35 ballots were counted in contravention of statutory requirements. The absentee ballots which remained in question before the superior court amounted to more than 2,500.

The regional canvass board has the responsibility for determining the validity of absentee ballots before they are counted. The board is directed not to count certain absentee ballots as specified in AS 15.20.210. The failure of the absentee ballot to be properly postmarked or dated when received by an election official is not included as a violation of the absentee ballot statute mandating the canvass board to invalidate the ballot.

The superior court properly concluded that the provisions regarding postmarking and date stamping by an election official were not mandatory, and refused to reverse the determination of the regional election boards. The court did, however, conclude that "election officials have disregarded the statutory scheme in a way that impels this court to its ultimate conclusion of cumulative malconduct."

We hold that except for the 35 ballots conceded to by the state as having been improperly counted, there was no malconduct. The purpose of AS 15.20.150 and of AS 15.20.170 is to provide methods by which to insure that absentee ballots have been cast on or before election day. All absentee ballots in question here were objectively determined to have been cast on or before the election day. The mandatory requirement that ballots be marked on or before election day is satisfied by a date received stamp, or a postmark, or the date of witnessing of the voter certificate, or any combination of these.

## 15. ONE WITNESS SIGNATURE ON ABSENTEE BALLOT

■■ Appellees contend that certain absentee ballots should not have been counted because in each case the voter's certificate on the back of the absentee ballot envelope had the signature of only one attesting witness. They contend this was in violation of AS 15.20.150 which they allege requires the signatures of two witnesses.

The court below found that AS 15.20.150 was amended by § 1 ch. 16 SLA 1977 to eliminate the requirement of two witnesses for absentee ballots cast by mail or personal representative. The new version of the statute allows casting of an absentee ballot "in the presence of *an* attesting wit*ness* . . . ." (emphasis added) Confusion has arisen because in the amended version of the statute there remains language from the old statute which refers to a now deleted portion, and to "attesting wit*nesses*." (emphasis added) The use of the plural

---

**30.** Since we have concluded that these actions by election officials did not constitute "malconduct," we need not decide whether they affected the results of this contested election.

form of the word "witness," we determine, was a legislative oversight—an error in drafting. *See* Informal Opinion of the Attorney General (3/30/77).

The superior court concluded that the clear intent of the legislature is that a single witness is sufficient and that the ballots with a single witness signature were properly counted. We agree with that conclusion. There is no malconduct involved.

### 16. COMPUTER BREAKDOWN

On election evening, the State of Alaska, Department of Administration computer was designated to process punch card ballots from the Juneau district. Shortly after processing began, problems developed with this computer. It was decided by the Data Processing Review Board that the Department of Labor computer, located in the same room, should be used instead.

Processing was begun on the Labor Department computer, and eight precincts were tallied before this computer also developed problems. By that time, the problems with the Department of Administration computer had been corrected. The Data Processing Review Board decided to complete the Juneau tally on that computer. This was done and calculation of the totals was completed using the summary cards and reports from both of the computers.

There is no indication that these calculations or the final totals were incorrect or inaccurate.

Both appellees and appellants agree that election officials violated provisions of AS 15.20.690. That statute requires, *inter alia,* that when a computer malfunctions during processing, necessitating removal of ballots to an alternate computer, all of the ballots shall be counted at the alternate site, including those already counted at the main location. (AS 15.20.690(b).)

In addition to that requirement, AS 15.-20.690(c) directs that all computer tapes resulting from the aborted counting operation shall be erased and the summary cards destroyed.

The superior court determined that these provisions are only technical requirements, violations of which should not cause disenfranchisement of such a large segment of the voting population.

We hold that the facts depicted indicate no significant deviation from a prescribed norm and we therefore conclude that there is no malconduct as to this issue.

### 17. PUNCH CARD BALLOTS

Appellees' contention on appeal that questioned or challenged ballots should have been cast on paper rather than punch card ballots has been disposed of by our order of October 6, 1978, in *Carr v. Thomas,* 586 P.2d 622 (Alaska). There, we concluded that it was not illegal to count certain questioned or challenged ballots merely because they were cast on punch card ballots. In the context in which this question is raised, punch card ballots are not distinguishable from paper ballots: the questioned and challenged punch card ballots were processed in the same manner as questioned and challenged paper ballots. Functionally, this satisfied the requirement of AS 15.15.215(a) to segregate challenged and questioned ballots until a determination as to their validity could be made.

### 18. EARLY COUNT OF PUNCH CARD BALLOTS

■ We agree with the superior court's conclusion that the early count of punch card ballots was permissible and did not constitute malconduct. AS 15.15.330 authorizes the early counting of paper ballots in precincts having 300 or more voters, which have been designated by the lieutenant governor. This early count provision also applies to punch card ballots, since we have decided that a punch card ballot is a form of paper ballot. (*See* discussion of use of punch cards for challenged and questioned ballots *supra.*) Punch card ballots are not distinguishable from paper ballots, either in the context of early counting or in the context of segregation of questioned and challenged ballots. The statutory distinction is rather between paper ballots and

machine ballots. Under AS 15.15.330 paper ballots, including punch card ballots, may be counted early.

Under the authority of AS 15.15.010 and 15.15.330, the lieutenant governor has promulgated regulations which govern the early counting of ballots. *See* 6 AAC 23.010–070. These regulations were presumably promulgated in accordance with the Administrative Procedure Act, AS 44.62.010–650, as required by *Coghill v. Boucher*, 511 P.2d 1297 (Alaska 1973), and the early count was carried out in substantial compliance with them. We therefore hold that the early count of punch card ballots was authorized by statute and properly conducted under the applicable regulations.

## 19. CHANGE OF NAMES—MARRIED WOMEN

█ A number of women voters[31] attempted to vote under their married names when they had been previously registered under their maiden names. Their votes were rejected.

Appellees contend that AS 15.07.070 imposes a duty upon the lieutenant governor to promulgate rules and regulations to enable voters to register, and that he did not fulfill his duty with regard to informing recently married women of the necessity of notifying the lieutenant governor of their change of names.

A person who changes his or her name will invariably need to notify various agencies in order to modify documents. There appears to be no affirmative duty on the part of the lieutenant governor or other election officials to inquire as to whether such a change of name has occurred. A voter whose name is changed by marriage may vote under her previous name or, if she desires to vote under her married name, she must notify the lieutenant governor at least 30 days before an election so that her registration may be amended to reflect the

change. AS 15.07.090(a). This information was set forth in the Alaska Voter Handbook.

The failure of the lieutenant governor to further notify recently married women of the necessity of advising him of their change of names under AS 15.07.090(a) does not constitute malconduct.

## 20. THE PROCEEDINGS OF THE 1977 LEGISLATIVE SESSION AND THEIR ASSERTED RELEVANCE TO THE ISSUE OF SCIENTER ON THE PART OF THE LIEUTENANT GOVERNOR AND OTHER ELECTION OFFICIALS

Appellees argue that the proceedings of the 1977 Legislature reflect that the lieutenant governor sought changes in Alaska's election code which would have allowed cross-district voting, the early counting of punch card ballots, and the use of non-election board members to transport punch card ballots. Based upon the foregoing, appellees further argue that the lieutenant governor was aware that the election code did not permit the aforementioned procedures without prior legislative sanction..

Legislative records reveal that two of the three bills which were introduced in the 1977 Legislature pertaining to election code reform were never reported out of committee. The single piece of electoral legislation which was enacted during the 1977 Legislature was vetoed by the governor. In his veto message to the Speaker of the House, the governor wrote, in part: "The objections to this bill all relate to those sections which provide for election-day registration of voters . . . ."[32] Given the foregoing, we find unimpressive appellees' attempt to use the 1977 legislative proceedings to demonstrate that the lieutenant governor, and other election officials, were

---

**31.** The Report of the Special Master indicates that 20 married women were not allowed to vote because they attempted to vote under their married names rather than their maiden names under which they were registered. The

Memorandum Decision of the superior court indicated that 14 votes were affected.

**32.** The legislation which was vetoed also provided for cross-district balloting.

guilty of malconduct in carrying out the 1978 primary elections.[33]

## CONCLUSION

Although at this time the court is not able to determine the prevailing candidates in the Merdes-Croft-Hickel-Hammond races, it is apparent, barring a contest resulting in a tie vote, or the reallocation of votes due to irregularities sufficient to change the results, that a general election should be held on November 7, 1978. As soon as is practicable, the votes for the respective candidates involved in the election contest and recount cases will be recomputed and certified pursuant to the terms of this memorandum and order and the separate order which will be entered in the recount case. Therefore, in order to insure the integrity of the forthcoming general election, the following specific further orders are entered:

1. The lieutenant governor is authorized to post the names of all registered voters, required by AS 15.07.140, as late as 10 days before the general election;

2. The lieutenant governor is authorized to conduct the staff training programs, required by AS 15.07.140, as late as 10 days before the general election;

3. The lieutenant governor is authorized to distribute sample and official ballots, original registers, duplicate registers and other forms and supplies to election supervisors, as required by AS 15.15.050, as late as 10 days before the date of the general election;

4. The lieutenant governor is authorized to distribute the election pamphlet, as required by AS 15.57.030 and AS 15.57.050, as late as 10 days before the general election;

5. The lieutenant governor is authorized to announce the general election, as required by AS 15.15.070, by publication of the date and nature of the election as late as 10 days before the general election;

6. The lieutenant governor is authorized to make absentee ballots available to voters, as required by AS 15.20.080, as late as 10 days before the general election;

7. The lieutenant governor is authorized to have available for distribution, as required by AS 15.20.080, all personal representative ballots, as late as 10 days before the general election;

8. The lieutenant governor is authorized to distribute absentee ballots for redistribution by election officials, as required by AS 15.20.040, as late as 5 days before the election.

### APPENDIX

### TABLE 1

ALLOCATION OF 88 INVALID VOTES FROM STATE'S MEMO (pg. 85) TO BE DEDUCTED FROM CANDIDATES HAMMOND AND HICKEL[1]

| District | Illegal Votes | Hickel | Allocated to Hammond | Other |
|---|---|---|---|---|
| 1 | 2 | 0.91 | 0.37 | 0.72 |
| 2 | 7 | 2.08 | 2.02 | 2.80 |
| 3 | 0 | – | – | – |
| 4 | 2 | 0.35 | 0.87 | 0.79 |
| 5 | 4 | 1.57 | 1.00 | 1.42 |
| 6 | 6 | 1.87 | 1.20 | 2.93 |
| 7 | 2 | 0.61 | 0.50 | 0.89 |
| 8 | 1 | 0.31 | 0.22 | 0.47 |
| 9 | 1 | 0.33 | 0.21 | 0.47 |
| 10 | 1 | 0.35 | 0.23 | 0.42 |

**33.** Though the governor's action in vetoing a bill constituted a part of the legislative process and may therefore be considered in determining legislative intent, *Shelton Hotel Co., Inc. v. Bates*, 4 Wash.2d 498, 104 P.2d 478 (1940); C. Sands, 2A Sutherland Statutory Construction § 48.05, at 201 (4th ed. 1973), rejecting a bill by the governor or the legislature is not always persuasive of a legislative decision not to change existing law. The rejection "may be due . . . to the belief that the proposed provision would be mere surplusage," or it might have been intended for clarification of an existing act. *Roderick v. Sullivan*, 528 P.2d 450, 455 n.13 (Alaska 1974) (citations omitted). *See People v. Puritan Ice Co.*, 24 Cal.2d 645, 151 P.2d 1 (1944); *Standard Oil Co. of California v. Johnson*, 24 Cal.2d 40, 147 P.2d 577 (1944). The governor's veto message was addressed only to election day registration, there is no basis for construing a specific legislative intent to change the law with respect to the other enacted portions of the bill.

1. This proration may have to be altered as a result of the counting of 249 ballots.

| District | Illegal Votes | Hickel | Allocated to Hammond | Other |
|---|---|---|---|---|
| 11 | 3 | 0.96 | 0.77 | 1.27 |
| 12 | 1 | 0.37 | 0.23 | 0.40 |
| 13 | 5 | 1.55 | 1.62 | 1.84 |
| 14 | 2 | 0.50 | 0.89 | 0.61 |
| 15 | 5 | 1.24 | 1.50 | 2.27 |
| 16 | 3 | 0.54 | 1.57 | 0.89 |
| 17 | 6 | 0.92 | 2.80 | 2.28 |
| 18 | 10 | 1.91 | 4.25 | 3.84 |
| 19 | 17 | 6.14 | 5.05 | 5.81 |
| 20 | 5 | 1.31 | 1.88 | 1.82 |
| 21 | 3 | 0.53 | 1.27 | 1.20 |
| 22 | 2 | 0.50 | 0.78 | 0.71 |
| TOTAL | 88 | 24.95 | 29.23 | 33.85 |

APPENDIX

TABLE 2

TOTAL ALLOCATION OF 97 INVALID BALLOTS – SEVEN INVALID – TWO TO BE ADDED BACK IN – NET OF 5 DIFFERENT FROM TABLE 1 – ASSUMING ALL SEVEN ADDITIONAL BALLOTS AND THE TWO DEDUCTED ARE ALL FROM ONE DISTRICT

| District | Total 97 Vote Allocation for Hickel | Hammond | Other |
|---|---|---|---|
| 1 | 27.22 | 30.15 | 35.66 |
| 2 | 26.51 | 30.68 | 35.85 |
| 3 | 26.03 | 31.35 | 35.66 |
| 4 | 25.83 | 31.41 | 35.80 |
| 5 | 26.92 | 30.48 | 35.63 |
| 6 | 26.51 | 30.23 | 36.30 |
| 7 | 26.48 | 30.48 | 36.08 |
| 8 | 26.51 | 30.33 | 36.19 |
| 9 | 26.58 | 30.27 | 36.18 |
| 10 | 26.71 | 30.39 | 35.94 |
| 11 | 26.59 | 30.51 | 35.97 |
| 12 | 26.75 | 30.37 | 35.87 |
| 13 | 26.50 | 30.85 | 35.69 |
| 14 | 26.21 | 31.46 | 35.37 |
| 15 | 26.19 | 30.73 | 36.12 |
| 16 | 25.86 | 31.85 | 35.33 |
| 17 | 25.72 | 31.57 | 35.75 |
| 18 | 25.91 | 31.36 | 35.77 |
| 19 | 26.76 | 30.72 | 35.56 |
| 20 | 26.26 | 31.11 | 35.67 |
| 21 | 25.83 | 31.34 | 35.89 |
| 22 | 26.19 | 31.19 | 35.65 |
| High | 27.22 | 31.85 | 36.30 |
| Low | 25.72 | 30.15 | 35.33 |
| Average | 26.37 | 30.86 | 35.82 |
| Median | 26.49 | 30.70 | 35.88 |

Thus, based on the average, the number of votes to be deducted from candidate Hickel is 26 and from candidate Hammond, 31. A similar computation should be utilized to determine the deductions from candidates Merdes and Croft.