[Nos. 29276-5-I; 31216-2-I.   Division One.   May 10, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. CARL
DAVID HANSEN, *Appellant.*

*In the Matter of the Personal Restraint of*
CARL DAVID HANSEN, *Petitioner.*

*James E. Lobsenz* and *Carney, Stephenson, Badley, Smith & Spellman,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Peter Goldman, Deputy,* for respondent.

AGID, J. — Carl David Hansen appeals the judgment and sentence entered against him for one count of possession with intent to manufacture or deliver cocaine and one count of possession of cocaine. He argues that the trial court erred by failing to obtain from him a knowing, intelligent, and voluntary waiver of a trial by 12 jurors, refusing to give the jury an entrapment instruction, excluding the testimony of a witness, and refusing to give a missing witness instruction. We affirm.[1]

Carl Hansen was charged by amended information with two counts of possession with intent to manufacture or deliver cocaine, contrary to RCW 69.50.401(a). Count 1 involved Hansen's alleged complicity in the purchase of a kilo of cocaine, and count 2 involved bindles of cocaine found in his briefcase and car. The following facts were established during Hansen's trial.

### FACTS RELATING TO THE CRIMES CHARGED

Wendell Brown, an informant for the King County Narcotics Task Force, told Detective Glen Edmondson that he knew a man named James Stegall who bought and sold cocaine. Stegall had previously been involved with Brown's "business" of selling stolen electronic equipment. The task force instructed Brown to do a "reverse buy" with Stegall, which meant that Brown would try to sell Stegall a kilo of cocaine. The police electronically wired Brown to record his meetings with Stegall.

Brown scheduled an initial meeting with Stegall on July 14, 1989, in the lounge of the University Plaza Hotel. Brown asked Stegall to bring everyone who would be involved in the transaction. Stegall brought Carl Hansen. Brown understood that Hansen "was the person who was going to bring the money for [the] transaction, or . . . was the person that was going to give Mr. Stegall the money to purchase the kilo

---

[1]This appeal was consolidated with Hansen's personal restraint petition which raises the sole issue of whether he knowingly, intelligently, and voluntarily waived his right to a jury of 12. In accord with our analysis of that issue in the context of Hansen's direct appeal, we deny Hansen's petition.

of cocaine." Brown believed that Stegall would be the contact person because Brown knew Stegall.

Brown, Stegall, and Hansen sat together at a table in the lounge and talked. The transcript of their conversation was admitted as evidence at trial and played for the jury during Brown's direct examination. At one point during the July 14 conversation in the lounge, Hansen left the table and the following dialogue concerning Hansen occurred:

BROWN: Anyway I don't know him anyway, so what's going on?
STEGALL: He's cool. Very, very cool.

. . . .

STEGALL: He drinks a lot. He's . . . he's had a little money and he's my friend. (unintelligible) . . . I used to sell to him.
BROWN: He's what?
STEGALL: I used to sell to him.
BROWN: Yeah.

. . . .

STEGALL: Okay, and . . . and I used to sell to him and I'd buy from him.
BROWN: Okay you . . .
STEGALL: I'd buy from him all the time.
BROWN: Okay yeah well, okay.
STEGALL: He had stuff and we bought (unintelligible) . . . half a key.
BROWN: Yeah.
STEGALL: The other day I picked up those for him.
BROWN: Yeah.
STEGALL: And we'd sell it together. You know, partners. I have beepers and we got beepers together and everything.
BROWN: Okay 'cause I don't know him, you know, and I'll, and what . . . alright, alright. 'Cause I . . .
STEGALL: Trust me.

. . . .

STEGALL: Don't worry about it. Just ask Bill about Carl and stuff. We uh buy all our stuff together. He's, Carl's okay.

. . . .

STEGALL: He needs, I was wondering how much a kilogram.

. . . .

BROWN: Well, if it's . . . whenever I . . . get a key from them . . . it's right around eighteen five . . .
STEGALL: We can get that price.

Hansen then returned to the table. After some small talk, Stegall and Brown began discussing the terms of the cocaine sale. As Brown described the cocaine, Hansen said, "Okay we'll get the one and try it and see what that looks like."

Stegall said, "15 ain't bad. It's cheaper than . . . Jesse's . . . there's no hassles with it." After Brown discussed how his source operated, Hansen asked him, "Now we're only going through you, right?" When Hansen later asked, "Okay, what can you do for 32?", this conversation followed:

> BROWN: I can give you . . . two [kilos] for 30. I'll do that . . . and I can still make money.
>
> [HANSEN]: Do they ever come down?
>
> STEGALL: Will they come down by five?
>
> BROWN: Well they . . . yeah, yeah, yeah, they do. . . .
>
> STEGALL: How much? What's the lowest we can get for that five?
>
> BROWN: Well, I've . . . only sold three. Okay? And uh they came down to fourteen five.
>
> STEGALL: Five.
>
> BROWN: At . . . at three. And I haven't, I haven't asked them for, you know, for a more quantity than that.
>
> [HANSEN]: No I mean if we're consistent.
>
> BROWN: What?
>
> [HANSEN]: Consistent.
>
> STEGALL: Like . . . we'll be buying and . . .
>
> BROWN: If you . . . are consistent, hey, you're the one. . . . [S]ee, I'm consistent with them, so they'll give me . . . those prices. . . . [T]hey're higher to other people, so uh now, if . . . if you guys become real consistent at . . . at buying . . . like two or three or you know, frequently, then . . . then they'll probably end up coming down to about 12, 12 or 13. More than likely. But they . . . about 1250, probably no more than that. No less than that. . . .

After discussing the terms of the deal, Brown offered to let Stegall and Hansen test a sample of the cocaine they would be buying. Stegall declined, saying "That's up to Carl [Hansen]". Hansen asked if he could take the sample with him and eventually walked outside with Brown. Brown gave him some cocaine, suggesting that he put it on his tongue to sample it. When Brown asked for money in exchange for the sample, Hansen asked if Brown had a smaller amount (a "teener", which is one-sixteenth of an ounce). Brown suggested that Hansen have someone "break it down and base it" to test it, and Hansen said, "Well my guy's gonna do the drip system". Brown then went to the rest room to measure out a "teener". When he returned to the table, Hansen had stepped outside so Brown gave the teener to Stegall.

After the July 14 meeting, Brown told Detective Edmondson about Hansen and, according to Brown, the detective told Brown "Go get him". Subsequently, Brown and Stegall had a series of telephone calls regarding the deal. Brown testified that Stegall was "the intermediary between the two of us", referring to himself and Hansen. Brown ultimately agreed to deliver 1 kilo of cocaine to Stegall for $15,000.

Brown met with Stegall alone on July 20, 1989, at the University Plaza Hotel. They went out to Brown's car where the kilo of cocaine was hidden. The men entered the car and Stegall gave Brown money in exchange for the kilo. Stegall assured Brown that all of the money was there because Hansen "guaranteed" it and he trusted Hansen. Brown electronically alerted the police that Stegall had purchased the cocaine, and they arrived to arrest Stegall. Hansen was arrested later that night at a different location. Bindles of cocaine were found in Hansen's car and briefcase at the time of his arrest.

According to Hansen's trial testimony, he had owned a small automotive repair shop and sold his accounts in 1988 for $175,000. After acquiring that money, Hansen bought a purple Corvette and began "partying" a lot with his friends. On one such occasion, he met a man named Jesse Brown, and in time Jesse asked Hansen to loan him $8,000. Jesse claimed that he owned a landscaping business and needed the money to complete a lucrative contract. He promised to repay Hansen the $8,000 plus an additional $500 in interest within 2 days. Under those terms, Hansen agreed to loan Jesse the money.

After 2 days passed, Hansen could not locate Jesse and, fearing he might not recover the $8,500, called several people who might know where Jesse was. Jesse contacted Hansen a few days later and told him to go to a certain house to get his money. Hansen did so. Jesse tried to repay him with cocaine, which Hansen refused. Later, while again trying to locate Jesse, Hansen contacted Jesse's landscaping company only to learn that Daniel Brown, Jesse's cousin, owned it and Jesse had no part in the business.

Hansen testified that Jesse later told him to go to a certain parking lot and wait for his money to be delivered. Hansen drove his Corvette to the specified location and, while he was parked, a white van pulled up beside him. Someone from the van tossed a package containing $7,800 into Hansen's passenger window and sped off before Hansen could see who it was.

On July 14, Stegall called Hansen and asked him to "party" with him. When Hansen drove Stegall to the University Plaza Hotel lounge in the Corvette, he had no idea that Stegall would be taking him to a meeting with Wendell Brown to discuss a cocaine transaction. He also had no idea, until he later listened to the tape, that Stegall told Brown that they were partners in cocaine transactions.

Although Hansen acknowledged that he had in fact said what the transcript indicated he said on the evening of July 14, he testified that he thought Wendell Brown was lying and he was only trying to call Brown's bluff. He had been to parties where people discussed drug deals so he knew what to say, but Hansen denied that he gave Stegall money to help purchase the cocaine or that Stegall bought the cocaine for him. He testified that he never intended to buy cocaine that night and that he did not know Wendell Brown had given Stegall cocaine. If he had known that, he would never have given Stegall a ride home in the Corvette because the police might have stopped them, found the cocaine, and confiscated the car.

Hansen testified that he continued trying to locate Jesse Brown between July 14 and July 20 to recover the remaining $700 Jesse owed him. On July 20, Stegall told Hansen he was meeting with Jesse Brown that evening and invited Hansen to join them so he could recover his money. Hansen believed that they were only going to be partying that night, but since he knew Jesse used cocaine he decided to drive his Volkswagen instead of the Corvette in case Jesse rode with him.

Hansen and Stegall met Jesse and another man, J.R. Ricetti, in the parking lot of a bar, and Jesse and Ricetti got

into the back seat of Hansen's car. Stegall told Hansen to drive over to the University Plaza Hotel. As Hansen drove, he asked Jesse for the money he owed him. He then heard Jesse and Ricetti counting money in the back seat. Jesse and Stegall started arguing about prices, and Hansen realized for the first time that the men were going to buy cocaine. According to Hansen's testimony, when Stegall gave him some money to count, Hansen refused and said he didn't want any part of the deal. He dropped Stegall off at the hotel and drove the other two men to the Keg Restaurant. He testified that he wanted to leave, but Jesse had not yet paid him back. Jesse refused to let him leave because he suspected Hansen and Stegall were going to "rip him [Jesse] off". Hansen finally convinced Jesse to let him leave with Ricetti, whose car was in the parking lot. To appease Jesse, Hansen gave him the keys to his Volkswagen as "security".

As Hansen and Ricetti were leaving, Hansen saw Jesse in the passenger seat of his Volkswagen talking on the cellular phone Hansen kept in his briefcase. Hansen got out of Ricetti's car and walked over to Jesse to get his phone. Hansen grabbed his open briefcase from the back seat and, as he stepped backward, was arrested by Detective Howard Gordon. He denied owning the bindle of cocaine the police later found in his briefcase or the other bindles found in a pack under the passenger seat of his car. He testified that, after being released from custody, he saw Jesse and again asked for the money Jesse owed him. According to Hansen, Jesse told him he had already been paid.

Detective Gordon testified about the statements Hansen made on arrest. When Gordon asked Hansen what he was doing that night, Hansen said he "was out making money" and that "he was being paid $500 to drive some people around" but he said he did not know why. Hansen "just knew he was supposed to drive them up there [to the University Plaza Hotel] and they were going to meet someone else there and something was going to take place, but he didn't know what."

## FACTS RELATING TO EMPANELING JURY
### AND ENTRAPMENT INSTRUCTION

At a pretrial hearing on March 22, 1991, the court suggested that the parties choose a 13th juror as an alternate because Hansen's trial would last 4 days. In response, defense counsel[2] said in Hansen's presence:

> I don't know if it is necessary. We would stipulate that if we start with twelve and we lose one . . . [t]hen we will waive the problem on losing the one. I don't think it is necessary to have thirteen. If we start with twelve and we have one that is sick and cannot participate, we will waive that problem and go with eleven. So that is on the record.

On March 25, the parties chose 12 jurors. Later that day, before the jury entered the courtroom, defense counsel requested a continuance until the next day. He stated:

> Your Honor, since part of the problem on a trial like this is selecting the jury, we had agreed we would have 12 and if one dropped out we would be bound by the 11.
>
> . . . .
>
> I was wondering if we can finish doing the juror[s] and maybe we can have the prosecutor do his opening statement and we could be dismissed and come back in the morning.

Because the State objected to continuing the case, the parties proceeded. The court indicated that one of the empaneled jurors, Mr. Keller, was unwilling to continue as a juror. When the court suggested questioning Keller on the record, defense counsel said:

> Your Honor, my client would have no objection of doing it with an eleven-person jury. If you would dismiss him, I don't want to go through the whole mess of another juror. I do feel uncomfortable if the juror himself or herself expressed the idea they would not like to be on specifically a four-day case.
>
> So we would have no objection to proceeding at this point with a[n] eleven-person jury with the same provision; if another one gets sick, we'll go with ten, if that's all right with counsel.

After Keller was questioned, defense counsel agreed that he should be excused as a juror. The State asked if the decision to excuse Keller was "still subject to the stipulation

---

[2]Counsel on appeal was not Hansen's attorney at trial.

of counsel that he's willing to go forward in this case with 11 jurors[.]" Hansen's counsel said "Yes, Your Honor, that still is. I know we don't want to be in a mess where we have to keep selecting jurors and jurors and jurors. Eleven would be sufficient." Similarly, when another juror became ill on the third day of trial and did not appear, the court asked defense counsel if he had any objections to proceeding with the remaining 10 jurors. He replied, "I am all right with ten."

The defense proposed an entrapment instruction which the court refused to give because the evidence was insufficient to support it.[3] The court also refused to give Hansen's proposed missing witness instruction relating to Jesse Brown. A jury of 10 found Hansen guilty as charged in count 1. It found Hansen not guilty as charged in count 2 but guilty of the lesser included offense of possession of cocaine. The trial court denied Hansen's motion for a new trial. Hansen now appeals the judgment and sentence entered against him.

## JURY OF 12

We first consider whether Hansen made a knowing, intelligent, and voluntary waiver of his right to have his trial heard by a jury of 12. Hansen argues that the waiver was invalid because neither his trial counsel nor the trial court ever discussed any aspect of the jury selection with him, including the consequences of agreeing to a jury of fewer than 12.[4]

---

[3]The instruction read:

"Entrapment is a defense to a criminal charge if the criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and the defendant was lured or induced to commit a crime which the defendant had not otherwise intended to commit.

"The defense is not established if the law enforcement officials did no more than afford the defendant an opportunity to commit a crime."

[4]Hansen argues that this is a constitutional issue and, thus, he may raise it for the first time on appeal. *See, e.g., State v. Scott*, 110 Wn.2d 682, 686, 757 P.2d 492 (1988); RAP 2.5, Comment (a), 86 Wn.2d 1152 (1976) ("certain constitutional questions can be raised for the first time on review"). Hansen cites no authority for the proposition that trial by a jury of less than 12 is such an issue, and we do not agree that this issue is the type of constitutional error that may be raised

Washington law grants every criminal defendant a constitutional right to a jury trial. Const. art. 1, § 22 (amend. 10); CrR 6.1; *Bellevue v. Acrey*, 103 Wn.2d 203, 207, 691 P.2d 957 (1984). A defendant may waive that right so long as the waiver is voluntary, knowing, and intelligent. *Acrey*, 103 Wn.2d at 207-08. Further, CrR 6.1(b) provides that, unless the criminal rules provide otherwise,

> the number of persons serving on a jury shall be 12, not including alternates. If prior to trial on a noncapital case all defendants so elect, the case shall be tried by a jury of not less than six, or by the court.

■■■■ Hansen's argument on this issue erroneously equates the constitutional right to a jury trial with the right to a jury of a specific number. A defendant's decision to be tried by a jury of fewer than 12 is *not* the same as a waiver of the right to a jury trial. *State v. Allman*, 19 Wn. App. 169, 173, 573 P.2d 1329 (1977), *review denied*, 90 Wn.2d 1009 (1978). So long as the defendant "acts intelligently, voluntarily, [and] free from improper influences", he or she can waive the privilege of a trial by a jury of 12 and submit the case to a jury of fewer than 12. *State v. Lane*, 40 Wn.2d 734, 737, 246 P.2d 474 (1952). Further, although a defendant's waiver of the right to a jury trial *altogether* must be in writing (*see* CrR 6.1(a)),[5] the law does not require a defendant's decision to be tried by a jury of fewer than 12 to be in writing. *Allman*, 19 Wn. App. at 173.

Hansen also erroneously assumes that a defendant's waiver of *any* constitutional right requires the defendant to make an

---

initially on appeal. *See Scott*, 110 Wn.2d at 687 (the constitutional error exception is narrow and "does not help a defendant when the asserted constitutional error is harmless beyond a reasonable doubt"). Nevertheless, we will address the issue because of its significance. *See Scott*, 110 Wn.2d at 688 (a reviewing court "may" refuse to review an asserted error that is not a constitutional error).

[5]Pursuant to CrR 6.1(a), "[c]ases required to be tried by jury shall be so tried unless the defendant files a written waiver of a jury trial, and has consent of the court." That written waiver requirement, which is *not* of constitutional magnitude, exists "to guard against silent waivers of jury trials." *State v. Wicke*, 91 Wn.2d 638, 642, 591 P.2d 452 (1979).

express waiver on the record and/or requires the trial court to engage in a colloquy with the defendant to determine if he or she made the waiver knowingly, voluntarily, and intelligently. To the contrary, the validity of a waiver of a constitutional right must be evaluated by considering the particular facts and circumstances of the waiver, the nature of the right being waived, and the presence of potential tactical reasons for the waiver. In *State v. Likakur*, 26 Wn. App. 297, 302-03, 613 P.2d 156 (1980), the court discussed some of the differences among a defendant's trial rights:

> [T]he various constitutional rights of the accused are accorded different procedural safeguards depending on the nature of the right itself and the circumstances of each case. A guilty plea amounts to a waiver of the entire arsenal of the accused's constitutional rights. Because of this, the acceptance of such a plea must be preceded by appropriate safeguards to determine that the plea is made intelligently and freely. The right to counsel is also a right to be guarded carefully. The ordinary layman would effectively be denied his right to a fair trial, which right embodies many other constitutional rights, without the assistance of counsel. He lacks both the skill and knowledge to adequately prepare and present his defense even though he has a perfect one. . . . *At a different level are the right to jury trial, the right to remain silent, and the right to confront witnesses. The trial strategy of any particular case may perhaps dictate the waiver of one or more of these rights while still preserving to the accused the right to a fair trial.*

(Citation omitted. Italics ours.)

We hold that a valid waiver of a jury of 12 requires neither a colloquy between the court and the defendant nor a statement on the record that the defendant expressly consents to the waiver. In this case, there is no basis in the record for concluding that a colloquy inquiring into Hansen's understanding that he had a right to a jury of 12 would have addressed the concern he raises on appeal; *i.e.*, that because of the unanimity requirement, he might have a better chance of acquittal or a hung jury with a full complement of jurors. Rather, in order to reach that point in understanding the ramifications of the right, it is likely that the court would have to venture into tactical considerations which are the

exclusive province of the attorney-client relationship. Such tactical reasons for a defendant's decision to waive a jury of 12 may include

> [t]he presence of defense witnesses who might not be available later, satisfaction with the personnel of the jury as drawn, a desire not to have the cause delayed, [or] reluctance to re-examine the jurors on *voir dire* to obtain another jury from the same panel[.]

*Lane*, 40 Wn.2d at 737. Any colloquy between the court and the defendant would be limited to stating the right and asking the defendant if he understands that right and voluntarily waives it.[6] It is difficult to conceive of a colloquy which could go far enough to ascertain whether the defendant also understands the potential advantages and disadvantages of a jury of fewer than 12 without crossing the line into the forbidden territory of privileged communications about defense strategy. Because the court may not properly ask about defense strategy, it is sufficient that defense counsel, on behalf of the defendant, agree on the record to proceed with fewer than 12 jurors.

Here, defense counsel agreed several times on the record in Hansen's presence to conduct the trial with 11, and later, with 10 jurors. Hansen clearly voluntarily agreed to these waivers.[7] Even in his affidavit, Hansen never claims that the waivers were not voluntary. He merely contends that he was not aware of the ramifications of the waivers and that he would not have agreed to a jury of 10 or 11 if he had been thoroughly informed of the implications. While that contention might be the subject of a claim of ineffective assistance

---

[6]This is precisely the colloquy that takes place when a defendant waives all of his or her trial and appeal rights to plead guilty to a criminal charge. This level of inquiry has never been found constitutionally lacking even when a defendant is waiving the entire panoply of rights.

[7]Thus, a bare statement on the record from Hansen that he agreed to the waiver would have served no purpose. Just as the trial court accepts without inquiry defense counsel's statement that his client will not testify, so too it may accept counsel's waiver of a jury of 12 when it is made on the record in the defendant's presence.

of counsel,[8] it does not support a conclusion that the waivers in this case of a jury of 12 were not knowing, voluntary, and intelligent.

Finally, Hansen argues that his right to a unanimous verdict compels the conclusion that he was entitled to a jury of 12. We disagree. At best, the two additional jurors whose participation defense counsel waived may have caused a hung jury and the need for another trial. Since 10 jurors found Hansen guilty, it does not follow that the participation of 2 more jurors would have resulted in an acquittal. An acquittal requires a unanimous verdict just as a conviction does. The trial court properly instructed the jury that its verdict must be unanimous and, thus, Hansen was not deprived of that right.

### ENTRAPMENT INSTRUCTION

The second issue on appeal is whether the trial court erred by denying Hansen's request for an entrapment instruction. Hansen contends that, because the trial court relied upon *State v. Draper*, 10 Wn. App. 802, 521 P.2d 53, *review denied*, 84 Wn.2d 1002 (1974), and did not consider the holding of *Mathews v. United States*, 485 U.S. 58, 99 L. Ed. 2d 54, 108 S. Ct. 883 (1988), it erroneously refused to instruct the jury on entrapment.

In Washington, the defense of entrapment is statutory:

(1) In any prosecution for a crime, it is a defense that:
(a) The criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and

---

[8]Hansen did not raise the issue of ineffective assistance of counsel on appeal or in his personal restraint petition. It appears that he did not do so because he could not have demonstrated that he was prejudiced by his counsel's alleged failure to consult with him about the waivers. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) (ineffective assistance of counsel requires findings of both substandard performance and resulting prejudice). He alleges no prejudice in the affidavit accompanying his personal restraint petition, and the best result he could have obtained if his counsel had not waived a jury of 12 was a hung jury and a new trial. We know of no reason to conclude or authority for the proposition that being unaware of all the possible consequences of a waiver of a jury of 12 amounts to prejudice per se.

(b) The actor was lured or induced to commit a crime which the actor had not otherwise intended to commit.

(2) The defense of entrapment is not established by a showing only that law enforcement officials merely afforded the actor an opportunity to commit a crime.

RCW 9A.16.070. The federal entrapment defense likewise has two prongs: (1) whether the defendant was induced to commit the charged crime and (2) whether the defendant was predisposed to commit that crime.[9] *United States v. Sullivan*, 919 F.2d 1403, 1418 (10th Cir. 1990); *United States v. Marino*, 868 F.2d 549, 552 (3d Cir.), *cert. denied*, 492 U.S. 918 (1989). The trial court need not give an entrapment instruction unless the defendant has satisfied both prongs of the analysis and shows that, as a matter of law, the instruction is warranted. *United States v. Fedroff*, 874 F.2d 178, 182 (3d Cir. 1989).

At the time of Hansen's trial, *Draper* stated the prevailing Washington case law interpreting the statutory defense of entrapment. The court held that a defendant is not entitled to an entrapment instruction unless he or she admits to committing the act charged. 10 Wn. App. at 806. The *Draper* court also held that, even when a defendant admits committing the act charged, an entrapment instruction is only warranted if the evidence supports the instruction, *i.e.*, demonstrates that the defendant was "lured, inveigled or induced into the commission of a criminal act" and lacked the predisposition to commit the act. 10 Wn. App. at 807.

██ ██ The subsequent holding of *State v. Galisia*, 63 Wn. App. 833, 836, 822 P.2d 303, *review denied*, 119 Wn.2d 1003 (1992) interpreted *Draper* as

---

[9]Inducement is "government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986). It "may take the form of 'persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship.' " *Ortiz*, 804 F.2d at 1165 (quoting *United States v. Burkley*, 591 F.2d 903, 913 & n.18 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 966 (1979)). *Ortiz* also defined predisposition as a "defendant's inclination to engage in the illegal activity for which he has been charged" which "may be inferred from a defendant's history of involvement in the type of criminal activity for which he has been charged, combined with his ready response to the inducement offer." 804 F.2d at 1165.

not requir[ing] a defendant to admit either the crime itself or all the elements of a crime before being entitled to an entrapment instruction. It is enough that a defendant admit acts which, if proved, would constitute the crime.

*Galisia*, 63 Wn. App. at 837. *Galisia* also described the quantum of proof necessary to satisfy the second burden on a defendant seeking an entrapment instruction:

While a defendant need not present that quantity of evidence necessary to create a reasonable doubt in the minds of the jurors to be entitled to an entrapment instruction, some evidence must be adduced to support it. In determining whether the evidence supports giving the instruction, a court should consider the defendant's testimony and the inferences that can be drawn from it.

Failure to give an instruction is reversible error if there was evidence to support the defense.

(Citations omitted.) 63 Wn. App. at 836.

In the present case, Hansen has failed to satisfy either prong of the entrapment analysis. He denied giving Stegall any money to help with the cocaine purchase from Wendell Brown, and said his participation in the July 14 meeting with Stegall and Brown was merely his attempt to call Brown's bluff. He also denied "having the state of mind required to demonstrate either accomplice liability (Count I) or possession (Count II)." *See* RCW 9A.08.020 (setting forth the elements of accomplice liability). Logic dictates the conclusion that a defendant cannot be entrapped into committing a crime with which he denies any connection. Thus, Hansen has not admitted *any* "acts which, if proved, would constitute the crime[s]" charged. *See Galisia*, 63 Wn. App. at 837.

Further, Hansen has failed to show that the evidence supported an entrapment instruction. As to count 1, which stemmed from Hansen's alleged status as an accomplice to Stegall's cocaine purchase, Hansen argues that both Wendell Brown and Jesse Brown acted as agents of the King County police and induced him into participating as he did in the transaction. We disagree. There was no evidence, even from Hansen, that Wendell Brown induced Hansen to participate in the purchase of the kilo. Wendell Brown did

nothing that amounted to "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *See United States v. Burkley*, 591 F.2d 903, 913 (D.C. Cir. 1978) (quoting Bar Ass'n of D.C., *Criminal Jury Instructions* 5.05 (3d ed. 1978)), *cert. denied*, 440 U.S. 966 (1979). Indeed, it was Stegall, not Wendell Brown, who invited Hansen to join him on July 14 and July 20. It was only after Hansen participated in discussing the deal on July 14 that Brown informed Detective Edmondson about Hansen's involvement and Edmondson said "Go get him". Further, based on Hansen's own testimony, he was unaware of any aspect of the kilo transaction. He can hardly argue that he was persuaded by the police to engage in a transaction of which he denies any knowledge. Even assuming that Jesse Brown had previously acted as an informant for Detective Edmondson, there is no evidence that Jesse was acting on behalf of the police in the Stegall transaction[10] and no evidence that there was any connection between Jesse's alleged involvement with Hansen and any inducement for Hansen to participate in Stegall's transaction.

The evidence is also insufficient to show that Hansen was entrapped into possessing the bindle of cocaine in his briefcase and the bindles under the passenger seat of his car as charged in count 2. Even if Hansen's contention that Jesse planted the cocaine in his car and briefcase were true, there is no evidence that Jesse was acting on behalf of the police. Thus, there is no basis to find entrapment. In sum, the evidence simply does not warrant an entrapment instruction for either count 1 or count 2 because Hansen did not admit that he committed or was even connected with any of the criminal acts, and the evidence of inducement was insuffi-

---

[10]Hansen's testimony that an anonymous person in a white van tossed $7,800 into his car in a place where Jesse Brown told him to wait for his money is not sufficient to show that Jesse was an agent for the police, even in light of Detective Edmondson's testimony that the police have a white van that they sometimes use in narcotics operations. There was no testimony linking Jesse Brown to this white van.

cient on either count. *See Fedroff*, 874 F.2d at 182 (defendant must satisfy both prongs of the analysis before an entrapment instruction is warranted).[11] The judgment and sentence of the trial court are affirmed.

The remainder of this opinion has no precedential value. Therefore, it will not be published, but has been filed for public record. *See* RCW 2.06.040; CAR 14.

PEKELIS, A.C.J., and COLEMAN, J., concur.

Review granted at 122 Wn.2d 1016 (1993).

---

[11]Hansen argues that *Mathews* should govern Washington entrapment law and, thus, he was not required to admit *any* acts involved with the crimes before being entitled to an entrapment instruction. We disagree with Hansen's reading of *Mathews*. The Supreme Court in that case held that

> even if the defendant denies *one or more elements* of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment.

(Italics ours.) *Mathews*, 485 U.S. at 62. *Mathews* does not hold that a defendant may deny any connection with the crime and still be entitled to an entrapment instruction. *Galisia* likewise held that a defendant need not "admit either the crime itself or all the elements of a crime before being entitled to an entrapment instruction." 63 Wn. App. at 837. It is sufficient that the defendant "admit acts which, if proved, would constitute the crime." 63 Wn. App. at 837. Hence, even if *Mathews* controlled our State's entrapment law, which it does not because entrapment law in Washington is statutory, not constitutional, *Galisia* and *Mathews* enunciate the same law.