Dana DANSEREAU; Gregory J. Gursey; Samuel Haywood; Kathy Haywood; C.E. Jenkins; Kim Ryan; James Weymouth; Rita T. Weymouth; T.J. Northcott; David D. Kyzer, M.D.; and Jane and John Does 1–10, Appellants,

v.

Fran ULMER, Lieutenant Governor, State of Alaska, and David Koivuniemi, Acting Director of the Alaska Division of Elections, Appellees.

No. S–6894.

Supreme Court of Alaska.

Sept. 22, 1995.

Wevley William Shea, Anchorage, for Appellants.

James L. Baldwin and Lauri J. Adams, Assistant Attorneys General, and Bruce M. Botehlo, Attorney General, Juneau, for Appellees.

Avrum M. Gross, Gross & Burke, P.C., Juneau, for Amicus Curiae North Slope Borough.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Dana Dansereau and nine other voters (Contestants) challenged the validity of the November 8, 1994 gubernatorial election in which Tony Knowles was elected to the office of Governor of Alaska.[1] The superior court granted summary judgment to the State of Alaska, thereby dismissing all of Contestants' claims. We affirm in part and reverse in part.

### II. FACTS AND PROCEEDINGS

Contestants challenged the election by filing suit in December 1994, alleging that malconduct by the State and corrupt acts by third parties had occurred and that those acts were sufficient to change the result of

---

1. The Contestants included as defendants: the State of Alaska; John B. "Jack" Coghill, former Lieutenant Governor; and Joseph L. Swanson, the Director of the Alaska Division of Elections under Governor Walter J. Hickel (collectively "State"). In accordance with Alaska Civil Rule 25(d), the current Lieutenant Governor and the Acting Director of the Division of Elections, Fran Ulmer and David Koivuniemi respectively, were substituted as defendants.

A recount requested by gubernatorial Candidate James O. Campbell was completed on December 3, 1994; it determined that Tony Knowles was elected by a margin of 536 votes. Candidate Campbell is not one of the Contestants. Although given an opportunity to do so, Contestants never moved for a preliminary injunction, and conceded that Candidate Knowles was capable of governing the State until there could be a new election.

the gubernatorial election. Contestants requested that the State conduct a new election for governor or declare James O. Campbell Governor of Alaska.

Contestants moved for summary judgment in mid-December 1994. The State cross-moved. The superior court granted the State's motion for summary judgment on February 8 and 9, 1995. This appeal followed. On appeal the North Slope Borough submitted an *amicus curiae* brief.

Contestants advance three main arguments. First, they argue that a North Slope Borough voter assistance program, which offered to reimburse rural voters for the gasoline they used to transport themselves to the polls, violated state and federal election laws. Second, they argue that a postcard sent to Doyon, Limited (Doyon) shareholders violated federal and state election laws, because it offered entry in a $1,000 cash prize drawing to those who submitted a ballot stub, or similarly sized piece of paper, and stated that the Alaska Federation of Natives (AFN) overwhelmingly endorsed Tony Knowles for governor. Finally, Contestants assert that the State committed election malconduct in its operation of the Prudhoe Bay voting station.[2]

### III. *DISCUSSION*

█ The right to vote encompasses the right to express one's opinion and is a way to declare one's full membership in the political community. Thus, it is fundamental to our concept of democratic government. Moreover, a true democracy must seek to make each citizen's vote as meaningful as every other vote to ensure the equality of all people under the law.

█ Alaska Statute 15.20.540[3] is the statutory mechanism through which voters can challenge, under prescribed conditions, election results which they believe denigrated their right to vote. Because the public has an important interest in the stability and finality of election results, *Dale v. Greater Anchorage Area Borough*, 439 P.2d 790, 792 (Alaska 1968), we have held that "every reasonable presumption will be indulged in favor of the validity of an election." *Turkington v. City of Kachemak*, 380 P.2d 593, 595 (Alaska 1963). However, if the party challenging an election proves that misconduct occurred and that it could have changed the result of the election, we may vitiate the election or determine which candidate was elected. *Boucher v. Bomhoff*, 495 P.2d 77, 80 n. 5, 82 (Alaska 1972). Under AS 15.20.540, Contestants have the "dual burden" of showing that there was both a significant deviation from statutory direction, and that the deviation was of a magnitude sufficient to change the result of the election. *Id.* at 80. We here review the summary judgment dismissing the Contestants' lawsuit.[4]

2. Contestants also argue that the State committed election malconduct by "disenfranchising" voters through its treatment of absentee ballots and residency disputes in the state Senate race for District J in Anchorage. All but forty of the disputed District J votes were counted in the race for governor. Contestants offer no evidence that substantiates a challenge to the determination regarding the forty ballots, nor do they offer any evidence that the alleged malconduct regarding these forty ballots would have been sufficient to change the outcome of the gubernatorial election.

Because the gubernatorial election is the only race challenged by Contestants, we need not consider any alleged malconduct which did not affect the gubernatorial election.

3. AS 15.20.540 provides:

*Grounds for election contest.* A defeated candidate or 10 qualified voters may contest the nomination or election of any person or the approval or rejection of any question or proposition upon one or more of the following grounds: (1) malconduct, fraud, or corruption on the part of an election official sufficient to change the result of the election; (2) when the person certified as elected or nominated is not qualified as required by law; (3) any corrupt practice as defined by law sufficient to change the results of the election.

4. When reviewing a grant of summary judgment, we must determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992). If the superior court's order granting summary judgment does not set out the court's reasoning, we presume that the superior court ruled in favor of the movant on all issues. *Saddler v. Alaska Marine Lines, Inc.*, 856 P.2d 784, 787 (Alaska 1993).

Contestants argue that the three events constitute malconduct or corruption under AS 15.20.540 sufficient to change the results of the gubernatorial election.

### A. North Slope Borough's Gasoline Reimbursement Transportation Assistance Program

During the 1994 election, the North Slope Borough (Borough) conducted a transportation assistance program allegedly designed to overcome the unique obstacles to voting participation posed by the Borough's vast and largely roadless geography. The Borough informed residents before election day that it would reimburse each voter for up to ten gallons of gasoline used by the voter to reach the polls. After voting, a resident could take his or her ballot stub to tables set up by the Borough near the election booths and fill out a "voter assistance voucher." On the voucher the voter would "swear or affirm" to the amount of gasoline used to transport the voter to the polls. The voter could then redeem the voucher for the specified amount of gasoline at a local fuel station before July 1, 1995. The Borough allowed all voters, regardless of how far they had travelled to the polls, to participate in this program.

Contestants argue that this program violated federal and state criminal election laws. Contestants allege that the Borough impermissibly expanded the transportation assistance program beyond the limited use condoned in advance by the United States Department of Justice Election Crimes Branch and that volunteers witnessing voters' signatures on gasoline vouchers allowed nearly all voters to claim ten gallons, even though most

voters had not used that much gasoline to reach the polls. Contestants further allege that the Borough instituted the transportation assistance program with the intent of helping Candidate Knowles win the election.

### 1. The transportation assistance program is not illegal under Alaska law

■ Contestants allege that the Borough's transportation assistance program violates AS 15.56.030 and is therefore a "corrupt practice as defined by law sufficient to change the results of the election" under AS 15.20.540(3).[5] Contestants characterize the Borough's program as a "gas for votes" program and argue that thousands of persons were paid the value of up to ten gallons of gasoline to vote.[6]

Although AS 15.56.030(a)(2) prohibits a person from paying another person to vote for a particular candidate, proposition, or question, no Alaska Statute prohibits a person from compensating another person for voting per se. See AS 15.56.030. Thus, assuming the Borough's program paid voters with fuel to vote in the election, regardless of the amount of fuel the voters used to reach the polls, the program would not be a corrupt practice as defined by Alaska law, unless the offers of payment were made with the intent "to induce the person to vote for or refrain from voting for a candidate at an election." AS 15.56.030(a)(2).

In stark contrast to federal election law, Alaska election law does not prohibit paying voters. See discussion infra. In this respect Alaska's statutory scheme is similar to the election laws of other states. For example,

---

**5.** AS 15.56.030 provides in pertinent part:
(a) A person commits the crime of unlawful interference with voting in the first degree if the person
....
 (2) gives, promises to give, offers, or causes to be given or offered money or other valuable thing to a person with the intent to induce the person to vote for or refrain from voting for a candidate at an election or for an election proposition or question ...
....
(b) Violation of this section is a corrupt practice.
(c) Unlawful interference in the first degree is a class C felony.

Contestants also allege that the program violates AS 15.56.020, which pertains to campaign misconduct in the second degree. However, Contestants have not alleged facts which would support this claim. Nor have they briefed this issue either before the superior court or this court. The argument is thus waived. Wirum & Cash Architects v. Cash, 837 P.2d 692, 713–14 (Alaska 1992).

**6.** The record establishes that the market price of ten gallons of gasoline in Barrow was approximately twenty-seven dollars on November 8, 1994.

under California law it is not unlawful to offer any form of consideration, including cash payment, to a person to vote, provided that the payment is not an inducement to or reward for voting for, or refraining from voting, for a particular person or measure.[7] California deleted language in the previous version of the statute

> dealing with voting, agreeing to vote, coming to the polls, or agreeing to come to the polls ... since [this language] could, conceivably, be used to punish someone for having rewarded a voter for doing what is his [or her] civic duty—namely coming to the polls and voting. Various bicentennial attempts to produce large turnouts this year may well be in violation of these subsections. What needs to be prohibited is rewarding a person for voting in a particular manner, something [the statute] continues to do.

*Legislative Committee Comment 1976 Addition*, former Cal.Elec.Code § 29621 (now § 18521).

Similarly, Washington State election law prohibits any person from "directly or indirectly offer[ing] a bribe, reward, or any thing of value to a voter in exchange for the voter's vote for or against any person or ballot measure, or authoriz[ing] any person to do so...." Wash.Rev.Code Ann. § 29.85.060 (West 1993). In contrast, Oregon election law prohibits a person from directly or indirectly "giving or promising to give money, employment or other thing of value" to a person with the intent to induce an individual to register or vote. Or.Rev.Stat. § 260.665(1) & (2)(a) (1993). However, Oregon specifically excludes "[f]ree transportation to and from the polls for persons voting" from this prohibition. Or.Rev.Stat. § 260.665(4)(f) (1993).

■ Although the language of AS 15.56.030(a)(2) is not as unequivocal as the language of California's law, which states that one may not offer compensation in exchange for "voting for any particular person," Cal.Elec.Code § 18521 (West 1995), it appears clear from a plain reading of AS 15.56.030(a)(2) that the prohibition against inducing a person to "vote for or refrain from voting for a candidate" under AS 15.56.030(a)(2) has an identical meaning. Thus, to show that the Borough's transportation assistance program violated AS 15.56.030(a)(2), Contestants must demonstrate that the Borough paid voters and did so with an intent to induce voters to vote for or refrain from voting for a particular candidate.

### a. *Payment for voting*

Contestants argue that this case is analogous to *United States v. Garcia*, 719 F.2d 99 (5th Cir.1983), where the court held that 42 U.S.C. § 1973i(c) prohibits not only paying a voter in cash, but also offering any item of value, such as a welfare food voucher, in

---

7. Cal.Elec.Code § 18521 (West 1995) provides in relevant part:
 A person shall not directly or through any other person receive, agree, or contract for, before, during or after an election, any money, gift, loan, or other valuable consideration, office, place or employment for himself or any other person because he or any other person: (a) Voted, agreed to vote, refrained from voting, or agreed to refrain from voting for any particular person or measure. (b) Remained away from the polls. (c) Refrained or agreed to refrain from voting. (d) Induced any other person to: (1) Remain away from the polls. (2) Refrain from voting. (3) Vote or refrain from voting for any particular person or measure.
 Section 18522 provides in relevant part:
 Neither a person nor a controlled committee shall directly or through any other person or controlled committee pay, lend, or contribute, or offer or promise to pay, lend, or contribute, any money or other valuable consideration to or for any voter or to or for any other person to: (a) Induce any voter to: (1) Refrain from voting at any election. (2) Vote or refrain from voting at an election for any particular person or measure. (3) Remain away from the polls at an election. (b) Reward any voter for having: (1) Refrained from voting. (2) Voted for any particular person or measure. (3) Refrained from voting for any particular person or measure. (4) Remained away from the polls at an election.

exchange for a vote.[8] *Id.* at 101–02. The State and Borough argue that *Garcia* and similar cases[9] are inapposite. They argue that programs with the primary goal of assisting voters in reaching the polls have long been upheld against challenges that such assistance constitutes a payment to vote.

In *United States v. Lewin,* 467 F.2d 1132, 1136 (7th Cir.1972), the court classified providing transportation to the polls as "assistance rendered by civic groups to prospective voters," rather than payment, and held that § 1973i(c) does not proscribe "efforts by civic groups or employers to encourage people to register." The United States Department of Justice appears to agree with this analysis.

> [T]he concept of "payment" does not reach things such as rides to the polls or time off from work which are given to make it easier for those who have decided to vote to cast their ballots. Such "facilitation payments" are to be distinguished from gifts made personally to prospective voters for the specific purpose of stimulating or influencing the more fundamental decision to participate in an election.

Craig C. Donsanto, *Federal Prosecution of Election Offenses* 18 (5th ed. 1988).

The distinction between "facilitative" programs and "gift" programs seems based in part on historical factors which preceded the passage of most voting rights legislation. *See Day–Brite Lighting v. State of Missouri,* 342 U.S. 421, 424–25, 72 S.Ct. 405, 407–08, 96 L.Ed. 469 (1952) (upholding state law requiring employer to allow employees four hours of paid leave on election day in order to vote); 111 Cong.Rec.S. 8986 (daily ed. April 29, 1965) (Section 1973i(c) does not prohibit the "practice that has been recognized and has been accepted by both political parties and all organizations with respect to helping to transport people who do not have means of transportation to the polls in order to cast

their ballots"). *See also Parsley v. Cassady,* 300 Ky. 603, 189 S.W.2d 947, 948 (1945) (upholding candidates' contribution of cars and trucks to assist in voter transportation as reasonable due to bad roads and wartime exigencies); *Watkins v. Holbrook,* 311 Ky. 236, 223 S.W.2d 903, 903–04 (1949) (upholding disbursement of money to provide for transport to polls to "get out the vote").

Perhaps more importantly, this distinction reflects the difficulty in balancing the need to minimize undue pecuniary influence in elections with the desire to encourage and facilitate maximum political participation. The State and Borough argue that the transportation program is a valid balancing of these two factors, while Contestants argue that the program is an invalid form of vote solicitation.

The North Slope Borough comprises 89,000 square miles and is inhabited by 5,760 people. The majority of these people are regularly involved in subsistence activities. The Borough's limited road system makes it difficult for residents in remote areas to reach voting facilities. In some cases, snowmobile or all-terrain vehicles are the only available modes of transportation. Fuel is especially expensive in the Borough, and because many residents do not participate fully in the cash economy, a fuel expenditure may be still more costly.

The Borough argues that many individuals who would like to vote will be deterred by the limited access to roads and the cost of transportation in the Borough. Thus, a transportation assistance program would clearly facilitate voting in the Borough. However, the Borough argues, the sorts of transportation programs already permitted in many other states, in which volunteers car-pool or bus voters to voting stations, would not be feasible in the Borough because

---

**8.** 42 U.S.C. § 1973i(c) provides in pertinent part: Whoever knowingly or willfully ... pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years or both....

**9.** *See United States v. Saenz,* 747 F.2d 930, 934 (5th Cir.1984) (prospective voters offered welfare

vouchers in exchange for voting for defendant); *United States v. Thompson,* 615 F.2d 329, 330–31 (5th Cir.1980), *cert. denied, Solis v. United States,* 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985) (defendant candidate for sheriff bought votes with liquor and cash and accompanied voters into booth to insure compliance).

of the limited road access and the distances involved.

The Borough claims its program is "more feasible and much cheaper" because it allows individual voters to provide their own transportation to the polls and then be reimbursed for the cost of fuel used by the voter to reach the polls. When the Borough began developing this program, Special Counsel to the Mayor contacted the Election Crimes Branch of the United States Department of Justice to ascertain whether the program might violate 42 U.S.C. § 1973i(c). The Borough described its proposed program as follows: "[t]he plan is to offer up to 10 gallons of gasoline to each voter who requests it. The gasoline will help cover these individuals' travel costs between town and their hunting, fishing, whaling or other sites. Each voter will *swear or affirm* to their need for the fuel to cover transportation costs on the application for fuel." The Borough explained that the assistance would not be payment because (1) the Borough's sole purpose was to facilitate voters reaching the polls or the registrar's office; (2) the transportation norms in the contiguous United States do not apply because of the lack of roads; (3) the large amount of off-road travel in the region removes many citizens from access to registrars and voting polls; and (4) the lack of telephones or other methods of communication with subsistence or other sites located outside of Borough communities makes offering a "ride to the polls" impractical.

The Election Crimes Branch responded with an informal opinion stating that "the outreach program as described in your letter in our opinion is clearly lawful under 42 U.S.C. § 1973i(c)." The Election Crimes Branch stated that its understanding was that the offer "would be made only to individual Native Americans [10] who are on active hunting status—or who are otherwise located in extremely remote areas of the North Slope Borough." Its response further stated that

> [w]e assume for the purposes of this letter that these offers of gasoline will be made

in a completely politically neutral manner; that they will not be connected in any way with specific candidates or political organizations; that they will be available to all individual Native Americans whose physical location satisfies the eligibility criteria describe[d] in your letter; ... and that the gas provided will not exceed that needed to transport the individual in question from his or her hunting camp to the nearest registration or polling site.

Its response concluded, "[i]n sum, the gasoline offer describe[d] in your letter, and as amplified by the assumptions summarized above, is functionally similar to an offer of [a] ride to the polls in jurisdictions that have roads and geographically concise populations."

■ Contestants argue that the Borough conducted the program "directly contrary to the advice and warnings" of the Election Crimes Branch by allowing participation by voters who did not meet the criteria set forth in the response, and by allowing many people to claim more gas than they actually used, resulting in a net pecuniary gain. Although Contestants presented no evidence that any particular voter actually received more fuel than necessary to reach the polls, they presented evidence that this was the likely result of the Borough's program. The 847 vouchers put into evidence by Contestants reveal that fewer than ten voters signed for less than ten gallons of gasoline. Contestants provided evidence suggesting that most Borough residents lived in communities no farther than twelve miles from the polls and thus lived too close to the polls to require ten gallons of gasoline for transportation on election day. Contestants also provided evidence that there may have been little significant subsistence activity on November 8 and further, that the Borough might not have taken adequate steps to ensure that voters did not receive more fuel than was necessary for transportation to the polls. Thus, construing the facts in the light most favorable to the nonmoving party, we hold that a factfinder could conclude that the Borough's program

---

**10.** The Borough's program as implemented was not limited to Native Americans, nor could it have been so limited consistent with the requirements of the Fourteenth Amendment to the Unit-

ed States Constitution or the Equal Rights Clause of article I, section 1 of the Constitution of Alaska.

paid voters to vote. *See Clabaugh v. Bottcher*, 545 P.2d 172, 175 n. 5 (Alaska 1976) (in ruling on a motion for summary judgment the court must draw all reasonable inferences in favor of the nonmoving party).

b. *Intent to induce a person to vote for a candidate*

As noted above, the Borough's program did not violate Alaska's election laws unless the payment to vote was made with the intent to induce a person to vote for or refrain from voting for a candidate. AS 15.56.030(a)(2). Contestants argue that the program is illegal because the Borough offered something of value in exchange for getting out the vote with the expectation that an increase in voter turnout meant an increase in votes for the Democratic candidate for governor, Tony Knowles. Contestants offered an affidavit in which Thomas Northcott affied that several months after the election, a Borough executive boasted about the high voter turnout in the area, and stated that the incentive behind the gas for votes program was to get Tony Knowles elected.

■ In reviewing the summary judgments entered against the Contestants, the court must draw all reasonable inferences in favor of the Contestants. The parties do not dispute that AS 15.56.030(a)(2) prohibits giving money or other valuable thing with an intention to persuade a person to vote for a candidate. (Because offering to give money or an other valuable thing can also violate AS 15.56.030(a)(2), we need not distinguish between the Borough's *offer* and its *delivery* of valuable vouchers to voters.) The averments in Northcott's affidavit would support a finding that the Borough, acting through its officials, intended the program to increase the number of votes cast for Candidate Knowles. Consequently, the question we must answer is whether AS 15.56.030(a)(2) prohibits a candidate-neutral program which gives or offers to give a thing of value in a manner that encourages persons who might otherwise not have voted to go to the polls and cast their votes for candidates for whom they were already inclined to vote.

■ We give the language of AS 15.56.030 its ordinary meaning when interpreting the statute because the language has not acquired a peculiar meaning through statutory definition or previous judicial construction. *Foreman v. Anchorage Equal Rights Comm'n*, 779 P.2d 1199, 1201 (Alaska 1989); *Wilson v. Municipality of Anchorage*, 669 P.2d 569, 572 (Alaska 1983). Alaska Statute 15.56.030(a)(2) prohibits offering a thing of value to a person "with the intent to induce the person to vote for" a candidate. The most common legal definition of "induce" is "to lead on, to influence, to prevail on, to move by persuasion or influence, to bring on or about, to effect, to cause." *See Commonwealth v. Mason*, 381 Pa. 309, 112 A.2d 174, 176 (1955) (defining "induce" as "to lead on; to influence; to prevail on; to move on by persuasion or influence ...; to bring on or about; to effect; to cause."); *People v. Drake*, 151 Cal.App.2d 28, 310 P.2d 997, 1003 (1957) (using same definition); *La Page v. United States*, 146 F.2d 536, 538 n. 2 (8th Cir.1945) (using same definition as *Drake*); *State v. Cook*, 139 Ariz. 406, 678 P.2d 987, 989 (1984) (the generally accepted meaning of "induce" is, "to lead on; to move by persuasion or influence"); Black's Law Dictionary 775 (6th ed. 1990) ("To bring on or about, to affect, cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on"); Webster's New Collegiate Dictionary 587 (1974) ("to lead on: move by persuasion or influence;" "to call forth or bring about by influence or stimulation"). These definitions connote an alteration of a person's previous inclination.

The terms "induce" and "inducement" appear to have been used most frequently in criminal law, especially in entrapment cases. This usage clearly indicates that inducement requires altering a person's disposition to act in a certain way. *See, e.g., State v. Hansen*, 69 Wash.App. 750, 850 P.2d 571, 579 n. 9 (1993), *reversed on other grounds, State v. Stegall*, 124 Wash.2d 719, 881 P.2d 979 (1994) ("inducement" such as might support entrapment defense, "is government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen will commit offense"); *United States v. Salmon*, 948 F.2d 776, 779 (D.C.Cir.1991) ("Inducement is government behavior that would

'cause[ ] an unpredisposed person to commit a crime.' ") (citation omitted).

■ In *Oregon Republican Party v. State of Oregon,* 78 Or.App. 601, 717 P.2d 1206, 1208, *remanded for dismissal as moot,* 301 Or. 437, 722 P.2d 1237 (1986), the court held that providing postage-paid envelopes which recipients could use to return requests for absentee ballots to the Republican Party's headquarters, did not constitute an inducement to vote under O.R.S. 260.665(2)(a). That statute prohibits inducing a person to register to vote. The court reasoned that because "[i]nducement implies the promise of an advantage as a result of performing the desired act," the advantage offered must have an independent value to the voter. *Id.* Without an independent value in exchange for the performance of the act, the thing offered did not induce the act of registering, but rather facilitated registration. *Id.* Applying the Oregon court's definition of inducement to this case, to prevail here Contestants must show that something of independent value—gasoline—was offered to encourage voters to cast their ballots for a candidate they would not otherwise have selected. It is insufficient that something of value was offered in exchange for inducing voting per se, because under Alaska law it is legal to compensate a person for voting per se.

Unless improperly influenced, voters will cast their ballots in accordance with their own criteria. No doubt voters are influenced by such legitimate criteria as their own socio-economic status and community values. Thus, residents of any given community may naturally tend to favor a particular candidate. Persons whose votes are facilitated by candidate-neutral transportation assistance programs will likely vote for the same candidates they would have favored if they had reached the polls without assistance. Potential voters who could benefit from transportation assistance may share beliefs or values which tend to favor a particular candidate. It is not surprising that some candidates or organizations employ transportation assistance programs to target persons of a particular socio-economic status or party registration, just as other candidates or organizations

may employ other programs, such as absentee ballot assistance, hoping to maximize participation of voters thought more likely to favor those candidates. *See Oregon Republican Party,* 717 P.2d at 1208 (discussing Republican Party mailing of absentee ballots with postage pre-paid envelope).

When voting, a person must choose one candidate over others. Thus, if the phrase "intent to induce to vote for or refrain from voting for a candidate" in AS 15.56.030 is not read to require an intent to persuade voters to choose candidates for whom they would not otherwise have voted, that statute would have to be construed as prohibiting payments for voting per se. As discussed previously, such a reading of the statute would conflict with its plain language.

■ There are many policy arguments for and against the "commercialization" of votes. *See, e.g., Day–Brite Lighting,* 342 U.S. at 428, 72 S.Ct. at 409 (Jackson, J., dissenting) (disagreeing with upholding state statutes which require employers to give employees two hours paid leave in order to vote and disapproving of "state-imposed pay-for-voting system[s]"); Pamela S. Karlan, *Not by Money but by Virtue Won? Vote Trafficking and the Voting Rights System,* 80 Va. L.Rev. 1455 (1994) (discussing dangers to the polity, especially to economically disadvantaged subsets, of vote-buying schemes and contrasting these schemes with voting incentive programs). These policy arguments have already been resolved in Alaska. The election practice statutes enacted by the Alaska Legislature do not proscribe voter incentive programs which involve compensation for voting, even if the sponsor of a program intends and expects that the program will benefit a particular candidate; they only prohibit payments intended to induce, i.e., influence or persuade, persons to vote in a different manner than they would have otherwise. It is not for the courts to second-guess this permissible legislative choice.

■ Applying that choice to the record before us, we find no evidence which would permit a reasonable inference that the persons responsible for the Borough's trans-

portation assistance program intended to induce voters to vote in a particular manner. Most significantly, there was no evidence the program as conducted was not candidate-neutral. Evidence that persons responsible for the program, by encouraging eligible citizens to vote, intended that the program would result in a net gain of votes for Candidate Knowles would be insufficient to prove a violation of AS 15.56.030(a)(2). As written, the statute does not prohibit payment to induce persons to vote who would not otherwise vote, so long as they are not induced to vote in a particular manner. If a program is candidate-neutral in fact, we must presume voters, in the sanctity of the voting booth, will vote as they would have had they made their ways to the polls without assistance or inducement.[11]

2. *The alleged violation of federal election law is not grounds for contest under AS 15.20.540*

Contestants assert that they can challenge the election under AS 15.20.540 because the Borough's program violated federal law.

Although a candidate-neutral program which offers compensation to encourage voting per se does not violate Alaska law, it appears to violate federal election law. *See* 42 U.S.C. § 1973i(c), *supra* note 8. That does not necessarily mean, however, that a given federal violation is ground for an Alaskan election contest.

The State and the Borough argue that the Alaska and federal election statutes do not make the violation of a federal criminal election statute a basis for invalidating an election. The State notes that election contests based on the acts of third parties must show that the third party committed a "corrupt

practice" as "defined by law." AS 15.20.540(3). The State argues that the Alaska Legislature has expressly defined specific acts as "corrupt practices," because it included the phrase "violation of this section is a corrupt practice" in particular election statutes. *See, e.g.,* AS 15.56.010(b); AS 15.56.030(b); AS 15.56.035(b). The State reasons that given the legislature's careful attention to this classification, it clearly did not designate the violation of federal criminal election law as a corrupt practice.

Contestants do not respond to these assertions. It would be inconsistent for the legislature not to prohibit candidate-neutral payments made to encourage voting, *see supra,* discussion of AS 15.56.030(a)(2), yet to regard such payments as a "corrupt practice" sufficient to set aside an election, whether or not they violated federal law. It is also unlikely the legislature would have considered acts violating federal election law, but not Alaska's election statutes, to be "corrupt practices as defined by law," given that the federal election statutes do not use that phrase. The absence of that phrase or some close equivalent in the federal election statutes tends to confirm that the Alaska Legislature did not intend that AS 15.20.540(3) election contests could be based on acts that violated federal, but not Alaska, election statutes.

We hold that an alleged violation of a federal election statute by a third party is not an independent ground for an election contest under AS 15.20.540(3). A violation of 42 U.S.C. § 1973i(c) by a person other than an election official can be ground for an election contest under AS 15.20.540(3) only if the violation is also a "corrupt practice" as defined by Alaska election law.[12]

---

11. The record reflects three other programs that offered potentially valuable consideration to persons who voted in the 1994 election. A private travel agent in Fairbanks gave $40 air fare discounts to 120–25 customers presenting a 1994 ballot stub on November 8 or 9, 1994. The Anchorage Chamber of Commerce offered a drawing for various prizes, including two round trip tickets, to persons submitting their ballot stubs; approximately 4,415 people entered that drawing. The Municipality of Anchorage People Mover bus system accepted an unknown number of riders' ballot stubs the day after the election in exchange for trips of any length, all day. There

is no indication in the record that any of those programs was not candidate-neutral.

12. Contestants also argue that there was election "malconduct" by State election officials under AS 15.20.540(1) because the Borough's program violated federal law and State officials approved that program. Having reviewed the record, we are persuaded that there is no genuine fact dispute, and that no State election official condoned or approved the program as it was actually conducted by the Borough. The trial court did not err in entering summary judgment against Contestants on this claim.

B. *Postcard Mailed to Doyon Shareholders*

The Tanana Chiefs Conference, Doyon, Limited and the Fairbanks Native Association (TCC/Doyon/FNA) mailed a postcard to Doyon shareholders before the election. One side of the postcard offered to persons who submitted an entry on the 1994 ballot stub, or similarly-sized piece of paper, an opportunity to participate in a drawing for one thousand dollars in cash. Participants had to submit entries to their tribal counsel office by noon the day after the election. Neither TCC, Doyon, nor FNA endorsed any candidate for governor in the November 8 general election. However, the other side of the postcard encouraged Native Alaskans to vote. This side stated that "it is *very important*" to vote and that "one vote does make a difference." It asked people to encourage their friends and relatives to vote in the general election. The following statement was centered on this side of the postcard: "At this year's Alaska Federation of Natives convention, Native delegates from across Alaska overwhelmingly endorsed Tony Knowles for governor." Contestants argue that the postcard and the drawing it advertised violated Alaska election law.

1. *Absence of language required by statute*

Contestants argue that the postcard violates Alaska election law because it did not bear the words "paid for by," as required by AS 15.56.010.[13] The State argues that the postcard satisfies the purpose of AS 15.56.010 and that its distribution should thus

not be considered a "corrupt practice" under AS 15.20.540.

Because the postcard was distributed by persons other than election officials, Contestants must demonstrate that its distribution was a "corrupt practice," not simply "malconduct." AS 15.20.540(1) & (3).

■ We first consider the significance of the omission of the information required by AS 15.56.010. This court has held that the term "malconduct" as used in AS 15.20.540 means a "significant deviation from statutorily or constitutionally prescribed norms." *Hammond v. Hickel,* 588 P.2d 256, 258 (Alaska 1978) (citing *Boucher v. Bomhoff,* 495 P.2d 77 (Alaska 1972)). Although *Hammond v. Hickel* involved claims of official malconduct rather than third-party corruption, given our prior holding that election statutes will be liberally construed to uphold the will of the electorate, *Carr v. Thomas,* 586 P.2d 622, 626 n. 11 (Alaska 1978), we choose to apply *Hammond*'s requirement of a significant deviation from statutory norms to all grounds for an election contest under AS 15.20.540.

■ In this case, assuming the language of the postcard was "intended to influence the election of a candidate," no significant statutory deviation occurred. AS 15.56.010(a)(2). The statute presumably requires that the postcard bear the words "paid for by" and the sponsor's name and return address.[14] However, the postcard identified its source, and also identified the Alaska Federation of Natives (AFN) as a supporter of Candidate Knowles. Thus, the apparent purpose of AS 15.56.010—to promote an informed electorate and to allow

---

**13.** AS 15.56.010(a)(2) provides that "[a] person commits the crime of campaign misconduct in the first degree if the person":

> knowingly prints or publishes an advertisement, billboard, placard, poster, handbill, paid-for television or radio announcement or other communication intended to influence the election of a candidate or outcome of a ballot proposition or question without the words "paid for by" followed by the name and address of the candidate, group or individual paying for the advertising or communication. . . .

**14.** The State argues that AS 15.56.010 does not apply to the postcard because the postcard does

not encourage voting for any particular candidate and because AS 15.56.010 does not apply to mailings from corporations to their investors. It is unnecessary for us to address those two arguments because we hold that distributing the postcard in violation of AS 15.56.010 was not a "corrupt practice" under AS 15.20.540.

Given our resolution of this issue, we do not find it necessary to consider whether, in light of *McIntyre v. Ohio Elections Commission,* —— U.S. ——, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (holding that an Ohio statute prohibiting distribution of anonymous campaign literature violated the First Amendment), AS 15.56.010 is valid. No party argues that it is not.

voters to evaluate the solicitations they receive—was substantially met. *Cf. Messerli v. State*, 626 P.2d 81, 87 (Alaska 1980) ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected.") (quoting *First National Bank v. Bellotti*, 435 U.S. 765, 792 n. 32, 98 S.Ct. 1407, 1424 n. 32, 55 L.Ed.2d 707 (1978)).

 Since distribution of the postcard did not significantly frustrate the purposes of AS 15.56.010, it cannot be said that the deviation from that statute was a "corrupt practice ... sufficient to change the results of the election" for the purposes of AS 15.20.540. Even assuming the deviation was sufficient to support a misdemeanor charge of violating AS 15.56.010, we hold that a technical failure to comply strictly with that statute is not sufficient to invalidate ballots where the purpose of the statute has been satisfied. *See Carr*, 586 P.2d at 625–26 (citing the "well-established policy which favors upholding of elections when technical errors ... do not affect the result of an election," and recognizing that courts are reluctant to permit a wholesale disfranchisement of qualified voters where a reasonable construction of the statute can avoid such a result). Consequently the failure to indicate on the postcard who paid for it is not ground for an election contest under AS 15.20.540(3) in this case.

### 2. *Legality of postcard mailing*

 We must next consider whether mailing the postcards was a corrupt practice on the theory that the postcards offered something of value and were distributed with an intent to influence the way voters cast their ballots, in violation of AS 15.56.030.[15] In response the State asserts that the drawing cannot have violated AS 15.56.030 because not only was participation in the drawing not contingent on a vote for Candidate Knowles, but drawing participants were not required to vote at all. The State reasons that because it was not necessary to vote to enter the drawing, entry in the drawing cannot be construed as a payment in exchange for the participant's vote. The trial court held that distributing the postcard "did not constitute a corrupt practice," and granted partial summary judgment to the State on that issue.

Insofar as is pertinent here, AS 15.56.030(a)(2) is violated when a person "[1] offers ... [2] money or other valuable thing [3] to a person [4] with the intent to induce the person to vote for or refrain from voting for a candidate...."

 By prominently mentioning the AFN's endorsement of Candidate Knowles, the postcard potentially encouraged recipients to vote for a particular candidate. This facially non-neutral message is evidence of an intent to induce persons to vote for a person they might not otherwise have favored. This non-neutral message distinguishes it from the North Slope Borough's transportation assistance program. The drawing offer conse-

---

**15.** The dissenting opinion suggests that we should refuse to reach this issue, on the theory Contestants have not squarely argued in their brief that the mailing of the postcard was a corrupt practice under AS 15.56.030(a)(2).

This court has discretion to reach an issue which has been inarticulately briefed by one party, especially where we, the trial court, and the opposing party have all been adequately notified that the matter is at issue on appeal. *Ratcliff v. Security Nat'l Bank*, 670 P.2d 1139, 1141 n. 4 (Alaska 1983).

Contestants' complaint and statement of points on appeal raise the question of whether the Doyon postcard violated AS 15.56.030. Contestants repeatedly invoke § .030; they twice quote § .030(a)(2) in their opening appellate brief. Contestants squarely argued that in the context of 42 U.S.C. § 1973i(c) the postcard offered something of value. In their memorandum opposing the State's cross-motion for summary judgment, Contestants argued that the postcard demonstrated an intent to encourage people to vote for a particular candidate. These are the two issues critical to determining whether distributing the postcard was a corrupt practice in violation of AS 15.56.030(a)(2). The State presented its position on § .030(a)(2) in its brief and memoranda before this court and the superior court.

While such a relatively oblique discussion of an issue might not always be sufficient, under the facts of this case we find that Contestants adequately raised the question of whether mailing the postcards violated AS 15.56.030(a)(2). We would be remiss in failing to reach this issue, especially considering that if we do not, persons may needlessly violate the statute and jeopardize future elections.

quently comes closer to offering a thing of value, a chance to win one thousand dollars, to encourage a vote for a particular candidate.[16]

We hold that the drawing offer potentially violated AS 15.56.030(a)(2), because it was accompanied by a non-neutral message. Given that message and the State's failure to demonstrate that there was no intention to induce voters to vote for a particular candidate, the trial court could not say as a matter of law that the mailing did not violate AS 15.56.030(a)(2).[17] The issue consequently could not be resolved on summary judgment.

### 3. Effect of postcard on election

We next consider whether the State was entitled to summary judgment on the alternative theory that the postcard did not affect the outcome of the election. See Wright v. State, 824 P.2d 718, 720 (Alaska 1992) (holding that "this court is not bound by the reasoning articulated by the trial court and can affirm a grant of summary judgment on alternative grounds"). The trial court did not reach this issue, having held as a matter of law that the postcard did not constitute a corrupt practice. We conclude that the record does not permit us to uphold the summary judgment on this alternative ground.

Assuming the TCC/Doyon/FNA drawing solicitation violated AS 15.56.030, to prevail at trial Contestants would have to show that the violation was of a magnitude "sufficient to change the results of the election." See AS 15.20.540(3); Boucher, 495 P.2d at 80.

Contestants moved for summary judgment, and argued in support that mailing the postcards to "thousands of individuals is sufficient to permeate the entire election with misconduct...." Contestants did not then or later offer any evidence that the mailing affected the outcome of the election.

In opposing Contestants' motion for summary judgment and cross-moving for summary judgment, the State offered evidence that fewer voters, and a lower percentage of the registered voters, cast ballots in House District 36, the Rural Interior District, in the 1994 general election than in the 1992 general election. The State offered the affidavit of a State labor economist who affied that "[t]he Alaska Native population of House District 36 includes American Indians in the Doyon Alaska Native Regional Corporation (ANRC) region of the interior, as well as Eskimos of the Calista ANRC Region." The economist identified other House Districts with other regional corporations. The State also offered the affidavit of TCC's general counsel. He affied that TCC is a "consortium of Interior Native villages and associations, and [is] the sponsoring regional organization under the Alaska Native Claims Settlement Act" for Doyon, whose shareholders and their descendants are Native members of the TCC member villages and associations. From this evidence, the State argued in support of its cross-motion that "District 36 includes the Doyon region of the Interior" and that many

---

**16.** Although the actual value of a chance to win one thousand dollars is potentially small, depending upon the number of drawing entrants, the perceived value of the chance to win a one thousand dollar drawing may be considerably higher in the eyes of potential participants. No party has argued that a chance to win one thousand dollars does not constitute an "other valuable thing" under AS 15.56.030(a)(2). Cf. Naron v. Prestage, 469 So.2d 83 (Miss.1985) (approving a candidate's cash drawing offer sent to registered voters). Given the State's failure to assert the existence of a genuine issue of material fact in response to Contestants' assertion (in the context of 42 U.S.C. § 1973i(c)) that the postcard offered something of value, we find the dissenting words of Chief Justice Patterson in Naron persuasive:

In my opinion, the offer of a chance to win cash by pursuing the citizen's duty to vote is little different from an offer to pay cash, in whatever amount, for a citizen to vote. The hope of winning something for little, if any, cash outlay has great popular appeal as is established by the growing popularity of state lotteries for greater tax revenues.

469 So.2d at 88. There is no genuine dispute regarding the value of the offer the postcards transmitted in this case. We do not find it necessary to decide here whether an offer of participation in a cash-prize drawing is always an offer of an "other valuable thing" under AS 15.56.030(a)(2).

**17.** Contestants also allege that the postcard violated 42 U.S.C. § 1973i(c). As discussed in part A2, supra, violation of a federal election statute is not an independent ground for an election contest under AS 15.20.540(3).

of the voters participating in the drawing voted in District 36. It argued that this information established that the drawing did not affect the election outcome.

Contestants have produced no evidence that the drawing solicitation influenced enough votes to change the outcome of the election. They simply assert that if the votes of all postcard recipients were awarded to Candidate Campbell, the result of the election would be changed. Although Contestants asserted in their opening appellate brief that the number of voters who received postcards can be determined exactly, so far as the record reveals, Contestants never conducted the discovery or analysis necessary to count the postcard recipients who voted and the record permits no inference about how many postcard recipients or drawing participants voted. Contestants candidly stated during oral argument before us that the record contains no evidence about how many people participated in the drawing. No evidence in the record permits an inference that the drawing actually affected the ballot cast by even one person who received a postcard. Likewise, no evidence in the record permits an inference about how many, if any, ballots were cast for Candidate Knowles or any other candidate as a result of the postcard mailing.

The Contestants' failure to produce any such evidence, however, is not necessarily determinative of this issue, because we must here decide whether summary judgment should have been granted to the State over the Contestants' arguments that there were genuine fact disputes about the effect of the postcard on the election.

█ In accordance with the principles now governing summary judgment in Alaska, the State, as the cross-movant seeking summary judgment, had the initial burden of making a prima facie showing that the postcard mailing did not affect the election. *See Yurioff v. American Honda Motor Co.,* 803 P.2d 386, 389 (Alaska 1990); *Bauman v. State, Div. of Family and Youth Svcs.,* 768 P.2d 1097, 1099 (Alaska 1989) ("[T]he proponent of a summary judgment motion has the initial burden of establishing the absence of genuine issues of material fact and his or her

right to judgment as a matter of law."). *See also* Alaska R.Civ.P. 56.

█ The facts submitted by the State in support of its cross-motion were relevant, and would, if unexplained and unrebutted, tend to support an inference the mailing did not increase the voter turnout, and therefore did not affect the election results. Nonetheless, the facts produced by the State did not amount to a prima facie showing that the alleged violation did not affect the election outcome. Simply showing that fewer District 36 voters participated in the general election in 1994 than in 1992 was insufficient because the State offered no evidence that turnouts in the two elections could be compared directly or that no other, independent circumstances may have depressed the District 36 turnout in 1994 or increased it in 1992. It offered no evidence about how many Doyon shareholders were registered voters in District 36, or how many Doyon shareholders voted in either election in that or any other district. Furthermore, the figures offered by the State indicated that the percentage of District 36 registered voters who voted in 1992 was *lower* than the statewide average that year, but that the percentage turnout there in 1994 was higher than the 1994 statewide average, a phenomenon that may undercut the State's assertion that the postcard did not influence the turnout in that district. The State's own evidence did not require a conclusion that the postcard did not influence the election outcome.

Moreover, the State's showing was not unrebutted. Contestants offered an affidavit executed by a person identified on Contestants' witness list as an expert in Alaska elections. He affied that the 1994 voter turnout should be compared to the turnout in 1990, since both were non-presidential election years. That opinion was sufficient to cast into doubt any direct comparison of voter participation in 1992 and 1994.

In a statement of genuine issues, Contestants asserted that mailing the postcards was a "corrupt practice" and that "corrupt practices" of TCC, FNA, and Doyon "injected extensive bias into the results of the 1994 governors [sic] election." They asserted the

cash drawing introduced sufficient corrupt practices into the election through extensive bias that "it could and probably would change the result of the election if eliminated." They also asserted that the corrupt practices "have introduced extensive bias into the 1994 governors [sic] election that requires a new election for the governor of Alaska."

We have stated that "every reasonable presumption will be indulged in favor of the validity of an election." *Turkington v. City of Kachemak*, 380 P.2d 593, 595 (Alaska 1963). *See also Hammond*, 588 P.2d at 260 (although malconduct may have impeached integrity of election process and placed true outcome "in doubt," malconduct not sufficient grounds for new election where more concrete standards do not indicate that the votes affected are sufficient to change the result of the election); *Boucher*, 495 P.2d at 86 n. 20 ("The presumption of validity given to elections and the diffidence with which the court attacks the results thereof places a heavy burden on the trial judge."); *Dale v. Greater Anchorage Area Borough*, 439 P.2d 790, 792 (Alaska 1968) (election contestant must strictly observe contest procedures because public policy demands that election results have stability and finality).

Given our conclusion that it was error to grant summary judgment to the State on the issue of whether the postcard violated AS 15.56.030, we could affirm this portion of the summary judgment only if we could conclude that the State made out a prima facie showing that any violation was not of sufficient magnitude to affect the election result. Because the State, as the movant, did not make that showing, it did not establish that it was entitled to judgment as a matter of law and did not establish the absence of any genuine issue of material fact. It was not entitled to summary judgment on this issue, and we cannot affirm the judgment on this alternative ground on the basis of the record before us.

### C. *Prudhoe Bay Absentee Voting Station*

The State decided in August 1994 to close the Prudhoe Bay absentee voting station, citing a decrease in transient population which no longer justified the cost of sending election workers to Prudhoe Bay and renting space to operate the absentee voting station. The State requested preclearance from the United States Department of Justice Civil Rights Division before it closed the absentee voting station. The Department of Justice replied that it had no objections to the closure. The State notified the oil extraction employers in the area that the station would be closed and trained these employers to assist voters in registering and distributing absentee ballot applications.

The day before the November 8 election, the Director of Elections decided to open the Prudhoe Bay absentee voting station after receiving several phone calls requesting that it be opened. The Director of Elections sent two election workers to the voting station on election day. The Division originally intended that the voting station would operate on November 8 until 5:00 p.m., but at 4:30 p.m., after consulting with the Division of Elections, the on-site election workers decided to extend the voting station's hours until 8:00 p.m. to accommodate voters who had been waiting in a two to three hour waiting line. Approximately seventy-five people voted at the voting station between 5:00 p.m. and 8:00 p.m., and the wait was reduced significantly by 7:30 p.m. A total of 308 people voted at the station.

Contestants argue that the Division of Elections' last minute decision to open the station "created a two to three hour waiting period," raising a question of "how many Prudhoe Bay workers wanted to vote but did not vote or could not vote due to the unreasonable wait imposed by the State." Contestants offer no evidence that voters *could not* vote because of the long wait, but do provide affidavits of two Prudhoe Bay workers who affied that they *did not* vote because they were unwilling to endure the hours-long waiting period. The State argues that the Director of Elections is given the authority to designate and supervise voting stations and that the Director properly exercised this discretion both in deciding to close the Prudhoe Bay station and in directing the station's operation on election day.

We have never held that an "unreasonable" wait at an absentee voting station, in itself, can be considered election malconduct. Nor do Contestants cite any cases to support this proposition. Moreover, it does not appear that the wait at the absentee voting station resulted from a lack of training or from the fact that the Director of Elections' decision to reopen the absentee voting station was made at the "last minute," or that it was otherwise "unreasonable."

The Director of Elections was not required to reopen the absentee voting station at Prudhoe Bay. AS 15.20.045(b).[18] As noted above, the State had decided to close the Prudhoe Bay voting station before the August primary and had trained Prudhoe Bay employers to assist voters in registering and distributing absentee ballot applications. The affidavit of Mark Humphrey, submitted by Contestants, provides evidence that voters at Prudhoe Bay were aware that the Director of Elections had previously decided not to operate the Prudhoe Bay absentee voting station. Contestants do not allege that any voter was unable to obtain, complete, or return absentee ballots by mail before the election. The State made considerable efforts to insure that Prudhoe Bay voters were aware well before election day that they would need to vote by mail.

The State offered evidence that decisions of the Division of Elections to reverse its original course and open the absentee voting station, and then to extend the station's hours, were made in good faith and were intended to accommodate, and in fact did accommodate, voters who would not have been able to vote because they had failed to return absentee ballots by mail. AS 15.20.081. Contestants have offered no facts creating a genuine fact dispute about those matters.

Furthermore, although the decision to open the station was made only the day before the election, Contestants do not allege that an earlier decision would have alleviated the wait on election day. Nor is there any evidence that the election workers were inadequately trained or unable to perform their duties. To the contrary, one of the employers which had requested that the absentee voting station be opened wrote to the Division of Elections commending the election workers. The letter noted the hard work of the Division staff, and thanked the Division for setting up the voting station on such short notice. The employer stated that "everyone I spoke with was happy they were able to vote."

In the context of an absentee voting station and under the facts presented by both parties, the good-faith operation of the Prudhoe Bay station is not malconduct even though voters had a long wait. *See Hammond v. Hickel,* 588 P.2d at 259 ("evidence of an election official's good faith may preclude a finding of malconduct under certain circumstances") (citing *Turkington,* 380 P.2d at 595).

## IV. CONCLUSION

We hold that the Borough's transportation assistance program did not violate AS 15.56.030(a)(2). We further hold that it was error to grant summary judgment to the State on Contestants' claim that the distribution of the postcard to Doyon shareholders was a corrupt practice under Alaska's election laws. We decline to affirm the summary judgment on that claim on an alternative theory that the postcard did not alter the outcome of the election since the State failed to meet its burden of proof on this issue. Finally, we hold that the State's operation of the Prudhoe Bay voting station did not constitute election malconduct.

We consequently REVERSE that portion of the summary judgment dismissing Contestants' claim regarding the postcard sent to Doyon shareholders. This issue is remanded for further proceedings not inconsistent with this opinion. We AFFIRM that portion of

18. AS 15.20.045(b) provides:

The director may designate by regulation adopted under the Administrative Procedure Act (AS 44.62) locations at which absentee voting stations will be operated on election day and on other dates and at times to be designated by the director. The director shall supply absentee voting stations with ballots for all election districts in the state and shall designate absentee voting officials to serve at absentee voting stations.

the summary judgment dismissing all other claims asserted by Contestants.

COMPTON, Justice, dissenting in part.

I dissent from section III.B.2 of the court's opinion. In that section the court reverses the trial court's grant of summary judgment in the State's favor on the issue of whether the TCC/Doyon/AFN postcard mailing violated AS 15.56.030(a)(2), even though Contestants never argued this issue on appeal. I would hold that the issue of whether the postcard mailing violated AS 15.56.030(a)(2) should not be considered, because Contestants failed to raise it.

In their brief, Contestants assert generally that "[t]he mailing [of the postcard] itself constitutes federal criminal violations under 18 U.S.C. section 597, [and] 42 U.S.C. section 1973i(c). Additionally, it is a corrupt practice as defined in A.S. 15.20.540, A.S. 15.56.010, and A.S. 15.56.030." Contestants then assert specifically a violation of AS 15.56.010, which requires the words "paid for by" on any communication intended to influence an election. Following this, Contestants focus entirely on 42 U.S.C. § 1973i(c), the so-called federal "cash for vote" prohibition. They cite federal cases and *Federal Prosecution of Election Offenses* (5th ed. 1988), which analyzes section 1973i(c).

Contestants never assert that the cash drawing announced in the postcard violates AS 15.56.030(a)(2), nor do they assert that the alleged federal law violation is a violation of AS 15.56.030(a)(2). Their general assertion, offered without elaboration, that "[t]he mailing ... is a corrupt practice as defined in ... A.S. 15.56.030" is the sum total of their argument on this issue. We require more than this under the waiver rule. *See, e.g., Wirum & Cash Architects v. Cash*, 837 P.2d 692, 713–14 (Alaska 1992) ("Where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

The court notes, as one justification for addressing the purported violation of AS 15.56.030(a)(2), that the State "presented its position" on the issue. Op. at n. 15. While it is true that in its argument the State cites to AS 15.56.030(a)(2)—something Contestants never do—it only does so as part of its larger argument that the postcard mailing did not violate the "corrupt practice" provision of AS 15.20.540(3). Furthermore, the focus of the waiver rule is on whether the *proponent* of a point has raised and adequately briefed it. The State's reference to AS 15.56.030(a)(2) did not relieve Contestants of their responsibility under the waiver rule to raise and brief the purported violation of that provision if they wished the court to consider it.

The other justification the court offers for addressing the AS 15.56.030(a)(2) issue is that, by doing so, it may prevent persons from "needlessly violat[ing] the statute and jeopardiz[ing] future elections." Op. at n. 15. Yet, on the "two issues critical to determining whether distributing the postcard was a corrupt practice," *id.,* the court (1) declines to decide whether a cash-prize drawing is always an offer of a "valuable thing;" and (2) remands the case for a determination of whether AFN intended to influence voters to vote for a particular candidate. Op. at 569–70 and n. 16. The court announces no new principle of law, nor does it resolve any of the key legal issues arising under AS 15.56.030(a)(2); it simply holds that the trial court erred in granting summary judgment in the State's favor on the AS 15.56.030(a)(2) issue. The court therefore does not accomplish what it sets out to do: In the future, a party contemplating a cash-prize drawing scheme will still not know whether such a scheme is permitted under AS 15.56.030(a)(2), and may therefore "needlessly violate the statute."

I might be persuaded that a "public interest" exception to the waiver rule should be adopted, were the court to propose one. It may well be that litigants should not be deprived of review of issues relating to strong public policy, affecting the citizens of the state as a whole, simply because the issues have not been adequately raised by counsel. On the other hand, in this case the court has embraced once again the rule that "every reasonable presumption will be indulged in favor of the validity of an election," citing *Turkington v. City of Kachemak*, 380 P.2d 593, 595 (Alaska 1963). If we are to indulge every reasonable presumption in fa-

vor of the validity of the election, the failure of the Contestants to raise the AS 15.56.030(a)(2) issue must constitute a waiver of that issue.

The court's resolution of the AS 15.56.030(a)(2) issue is troublesome for reasons other than that it cannot be said fairly that the issue was raised by Contestants. First, the court provides virtually no guidance to the superior court on how to address the issue on remand. For example, the court does not declare whether the intent to induce is to be determined by applying an objective or a subjective standard.

Second, the court holds that "there is no genuine dispute regarding the value of the offer the postcards transmitted in this case," Op. at n. 16, without any evidence in the record that the cash drawing at issue is a valuable thing to the target voting group. The court rests its holding on the assumption that "[a]lthough the actual value of a chance to win one thousand dollars is potentially small, depending upon the number of drawing entrants, the perceived value of the chance to win a one thousand dollar drawing may be considerably higher in the eyes of potential participants." *Id.* In deciding previous election contests, we have relied on expert testimony or other evidence, rather than mere conjecture, to determine whether election laws were violated. *See, e.g., Boucher v. Bomhoff,* 495 P.2d 77, 81 (Alaska 1972) (voiding vote on constitutional convention referendum; decision based in part on expert testimony that the misleading ballot language biased voters). Today the court strays from this practice, and bases its holding that the drawing offered a valuable thing on nothing more than its own sense of what the drawing participants may have perceived.

After holding that there can be no genuine dispute that the cash drawing in the present case was an offer of a valuable thing, the court states, as previously noted, that it need not decide whether a cash drawing is *always* an offer of a valuable thing. Op. at n. 16. If the court is not prepared to say that a cash drawing is always an offer of a valuable thing, how can it say, without supporting evidence, that the cash drawing in this case is an offer of a valuable thing? If a cash drawing is not *always* an offer of a valuable thing, then the question must be factual. If so, its resolution should be left to the trial court.

This is the mischief played when courts take it upon themselves to address issues to which the litigants have paid scant, if any, attention. When there are no criteria to guide a court in addressing an issue not raised by the litigants, "the decision whether a litigant gets a new trial becomes wholly arbitrary." *Clark v. Greater Anchorage, Inc.,* 780 P.2d 1031, 1039 (Alaska 1989) (Compton, J., dissenting in part).

Contestants have not raised a claim that the postcard mailing violated AS 15.56.030(a)(2). Their sweeping assertion that the mailing constituted a corrupt practice under AS 15.56.030 does not ever address subsection (a)(2). They have failed utterly to argue that the cash drawing was "money or [an]other valuable thing" offered "with the intent to induce the [voter] to vote for or refrain from voting for a candidate." Because they have failed to argue this point, the court should not consider it. I would affirm the judgment of the superior court.